**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0930n.06

**No. 14-1119**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| SYED SAMI, M.D., | ) | **FILED** |
| | ) | Dec 16, 2014 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | |
| | ) | **ON APPEAL FROM THE** |
| DETROIT MEDICAL CENTER, | ) | **UNITED STATES DISTRICT** |
| DAVID MARKEL, M.D., and | ) | **COURT FOR THE EASTERN** |
| STEPHEN F. LEMOS, M.D.,| ) | **DISTRICT OF MICHIGAN** |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE:    GIBBONS and KETHLEDGE, Circuit Judges; DOW, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** Plaintiff Syed Sami was terminated from his medical residency program. Sami brought suit for wrongful termination against both his employer, Detroit Medical Center ("DMC"), and some of the doctors in charge of the residency program. Specifically, Sami alleged (1) national origin discrimination under Title VII against DMC; (2) retaliatory harassment under Title VII against DMC; (3) violation of the right to make and enforce contracts under 42 U.S.C. § 1981 against DMC; (4) national origin discrimination under the Michigan Elliot-Larsen Civil Rights Act ("ELCRA") against DMC and defendant Dr. Stephen Lemos; (5) retaliation under ELCRA against DMC and Lemos; (6) breach of contract against DMC; (7) tortious interference with a contract or business expectancy against defendant

---

[*] The Honorable Robert M. Dow, Jr., United States District Judge for the Northern District of Illinois, sitting by designation.

Dr. David Markel; and (8) conspiracy against all defendants. Sami now appeals the district court's decision to grant summary judgment to the defendants on all claims. For the following reasons, we affirm the district court's decision.

## I.

## A.

Syed Sami was born in Pakistan. He moved to the United States, became a citizen, and received his medical degree. In July 2008, Sami began his residency in orthopedics at the Detroit Medical Center.[1] Throughout the residency program, Sami had numerous documented issues with his performance.

### First Year of Residency

Although Sami's first year was relatively uneventful concerning his performance as a resident, Ralph Blasier—the program director for Sami's residency—noted that Sami had a "difficult start" which "led to a breakdown in communication between his Chief Resident[, Jonathan Vigdorchik], which was barely satisfactorily resolved by the end of the rotation." According to Sami, Vigdorchik ridiculed him by referring to him as "the terrorist from Al-Qaeda" and "Taliban."

### Second and Third Years of Residency

In his second year, Sami completed a research and an orthopedic rotation at Providence Hospital under Markel's supervision. During these rotations, Sami claims that Markel made several inappropriate comments about Sami's national origin. These comments included telling Sami "[w]e're not going to send a Taliban with a bomb [vest]," suggesting that Sami should

---

[1] DMC runs its orthopedic residency program in conjunction with Providence Hospital. The program is accredited through the Accreditation Council for Graduate Medical Education ("ACGME"), which ensures national and uniform quality among residency programs. Moreover, DMC's residency programs are overseen by the Office of Graduate Medical Education ("GME").

"quit watching Middle Eastern porn," and mocking Sami's accent. Markel's evaluation noted Sami's failure to meet expectations in several areas, including performing surgery with the appropriate skill.

Sami returned to DMC for his rotation in the trauma unit, where he was again paired with Vigdorchik. According to Sami, two weeks into his rotation, Vigdorchik circulated a formal complaint about Sami. The five page complaint, signed by five residents, consisted of a long list of purported misdeeds committed by Sami.

From April 2010 through July 2010, Sami returned to Providence for another rotation. During this time, Sami claims that Markel called Sami on several occasions to tell him that he would be fired if his performance did not improve. Additionally, various hospital personnel reported disturbing incidents about Sami: (1) On June 18, 2010, Alicia Marabanian, a nurse anesthetist at Providence, reported that Sami injected a patient without warning, and yelled "code brown" after that patient had an inadvertent bowel movement. (2) On June 28, 2010, a nurse at Providence reported that Sami marked the wrong hip on a patient scheduled for surgery. After learning of this report, Sami called the Team Leader for Orthopedics at Providence, "yell[ed]" at her, and demanded to know who informed Markel of the incident. (3) On June 30, 2010, Sami told Blasier that "all the [J]ews at Providence are out to get him fired." On the same day, Sami confronted Marabanian for reporting him and, at the end of the conversation, asked her if she was Jewish. (4) On July 14, 2010, a nurse reported that Sami removed a digital camera from an operating room, despite a doctor's express instructions not to do so.

On July 15, 2010, the Orthopedic Residency Education Committee ("OREC")[2] voted to place Sami on academic remediation.[3] OREC based its decision on Sami's "[i]nconsistent

---

[2] OREC is a group of orthopedic surgeons from several program sites. Its members advise the Program Director on the residents' progress.

3

performance evaluations," "[i]nappropriate behavior," "[i]nability to take constructive criticism," and substandard medical knowledge. Successful completion of his remediation was conditioned upon seven requirements, including that the "program must not receive any additional complaints about [Sami's] performance or behavior" during the remediation period.

In the midst of his remediation period, however, Sami lied to his superiors. On October 10, 2010, Sami took a 30-day leave of absence to care for his schizophrenic brother and "mov[e] him to [his] family overseas." Although monetary concerns prevented Sami from travelling to Pakistan, upon his return to work, Sami told his supervisors he did indeed go to Pakistan. Only when pressed for documentation of his trip[4] did Sami admit that he "[chose] to lie" to his various supervisors. Consequently, Sami was suspended from the program two days later.

On November 18, 2010, six days after Sami admitted to lying, OREC unanimously recommended Sami's termination based on his performance on his sports-medicine rotation and his Pakistan trip fabrication.

On December 8, 2010, Michael Campbell, Director of Medical Education at Providence Hospital, sent a letter notifying DMC's Program Director that Sami was to be "removed from any future rotations" at Providence. To justify his decision, Campbell highlighted eight issues with Sami: he incorrectly marked a surgical site, he exhibited a subpar quality of patient care, he failed to communicate in a timely manner with other residents and attending physicians, he acted unprofessionally, he made harassing calls to hospital staff, he disregarded policies relative to camera use, he accused members of the Jewish faith as being "out to get him," and he contradicted himself when rationalizing his actions.

---

[3] Under the procedures of the residency program, "[a]cademic remediation is not a corrective action procedure," but failure to satisfy the terms of remediation can be grounds for probation or termination.

[4] Apparently, the program needed documentation of his trip because it allowed him to leave under "special circumstances."

On December 14, 2010, the DMC formally requested Sami's termination from the program based on his failure to successfully complete remediation, his Pakistan trip fabrication, and his removal from Providence hospital. Under the applicable corrective action procedure, Deborah Kellogg, corporate director of DMC Graduate Medical Education Programs, began her investigation into Sami's performance. On January 13, 2011, she determined that Sami's termination was warranted and submitted the matter to a committee of three independent physicians for a hearing.

The hearing took place February 10, 2011. Sami's attorney filed a pre-hearing brief with attached exhibits and accompanied him to the hearing. During the hearing, Sami had the opportunity to testify on his own behalf in response to the committee's questions. Although the committee found "ample evidence" to support Sami's termination from the program, it decided to "extend one final opportunity to Sami to remain in the Program . . ." subject to specified terms and conditions.

Based on the committee's determination, DMC placed Sami on 6-months' probation. Included in the terms of Sami's probation was that "[t]he program must not receive any reports of patient care events that pose a danger to patient care," and Sami must "achieve a grade of 'pass' on all four sections of [the Mock Oral Boards.]" Sami signed the letter agreeing to comply with these terms, aware that his failure to meet either of these requirements would result in his termination from the program.

After Sami's 6-month probation, OREC held a special meeting to review Sami's performance. OREC determined that he failed to meet the terms of his probationary period. Specifically, "Sami failed to pass all four sections of his Mock Oral Boards", he "continues to have difficulty with his communication skills," and "he continues to struggle with self-

assessment and accepting responsibility for his actions." As a result of these concerns, OREC voted unanimously to recommend Sami's termination from the program. Pursuant to procedure, Kellogg again reviewed all of the evidence, determined that termination was warranted, and submitted the matter to the corrective action committee for its independent review.

The committee held a hearing on November 3, 2011. After deliberation, the committee concurred with the unanimous recommendation of OREC that Sami should be terminated. The committee found Sami's termination warranted due to the reasons cited by the program, and his various patient care missteps.

After appealing the decision to DMC's chief medical officer, the termination was upheld. Sami was terminated from the program on December 2, 2011. Sami thereafter filed a formal complaint with ACGME[5] alleging that the corrective action proceedings violated ACGME's guidelines. Following an independent review, ACGME held that "the institution and program were in substantial compliance with ACGME requirements and there were no violations and validity to [Sami's] complaint."

B.

Sami brought suit against the DMC, the Program Director Lemos, and acting Program Chair/Providence Site Director Markel, claiming his termination was unlawful. Specifically, Sami alleged (1) national origin discrimination under Title VII against DMC; (2) retaliatory harassment under Title VII against DMC; (3) violation of the right to make and enforce contracts under 42 U.S.C. § 1981 against DMC; (4) national origin discrimination under the ELCRA against DMC and Lemos; (5) retaliation under ELCRA against DMC and Lemos; (6) breach of contract against DMC; (7) tortious interference with a contract or business expectancy against

---

[5] The Accreditation Council for Graduate Medical Education is a national governing body that ensures uniformity among residency programs. *See supra*, n. 1.

6

Markel; and (8) conspiracy against all defendants. The district court granted the defendants' motions for summary judgment on all claims, concluding that Sami failed to present evidence that creates fact questions necessary for trial.

On appeal, Sami does not challenge the district court's grant of summary judgment to the defendants on his claim under 42 U.S.C. § 1981 or his breach of contract claim. Therefore, those claims are considered to be abandoned and are not reviewable on appeal. *See Enertech Elec., Inc. v. Mahoning Cnty. Comm'rs,* 85 F.3d 257, 259 (6th Cir. 1996). Furthermore, Sami fleetingly mentions that the district court erred in granting summary judgment on three claims: (1) his retaliation claim against DMC and Lemos under Title VII and ELCRA, (2) his national origin discrimination claim against Lemos pursuant to ELCRA, and (3) his retaliatory harassment claim against DMC. (Appellant's Br. 21, 22.) He dedicates one sentence to his argument and fails to cite any supporting legal authority. Consequently, these arguments are also considered waived. *See Dillery v. City of Sandusky,* 398 F.3d 562, 569 (6th Cir. 2005) ("It is well-established that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks omitted)); *see also* Fed. R. App. P. 28(a)(8)(A) (requiring appellant's brief to provide "contentions and the reasons for them, *with citations to authorities* and parts of the record on which the appellant relies" (emphasis added)); *Bronson v. Swensen,* 500 F.3d 1099, 1105 (10th Cir. 2007) ("But these cursory statements, without supporting analysis and case law, fail to constitute the kind of briefing that is necessary to avoid application of the forfeiture doctrine."). Sami's national origin discrimination claims under Title VII and ELCRA against DMC are properly before this court, as are his tortious interference with business and conspiracy claims.

II.

A district court's grant of summary judgment is reviewed *de novo*. *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012). In considering a motion for summary judgment, the district court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Id.* "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) (internal quotation marks omitted); *see* Fed. R. Civ. P. 56(a), (c). "The moving party bears the initial burden of showing the absence of a genuine issue of material fact." *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). Once the movant has satisfied its burden, the nonmoving party must produce evidence showing that a genuine issue remains. *Id.*

The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Summary judgment is proper when the nonmoving party has had adequate time for discovery and yet "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

III.

A.

"Cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases." *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004). To establish a Title VII employment discrimination claim, Sami must "present direct evidence of

discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003). "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).

If based on circumstantial evidence, a discrimination claim is evaluated using the burden-shifting analysis described in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792, 801−05 (1973). Under this framework, Sami has the initial burden to establish a *prima facie* case of discrimination by showing that: "(1) he is a member of a protected class; (2) he was terminated; (3) he was qualified for the position; and (4) he was replaced by a person outside a protected class or was treated differently than a similarly situated, non-protected employee." *Abdulnour v. Campbell Soup Supply Co.,* 502 F.3d 496, 501 (6th Cir. 2007). Once Sami demonstrates a *prima facie* case, the burden shifts to DMC to produce evidence of a "legitimate, nondiscriminatory reason" for its actions. *Id.* at 502. If DMC meets this burden, the onus is on Sami to demonstrate that the proffered legitimate reason is pretextual. *See id.*

Sami argues that the alleged comments made by Vigdorchik and Markel constitute direct evidence of discrimination. He points to three comments purportedly made by Vigdorchik: (1) calling Sami "a terrorist from Al-Qaeda," (2) referring to Sami as "Taliban," and (3) while looking at an X-ray analysis of a blast injury, stating "[Sami] might make us look like this." Sami also highlights three statements supposedly made by Markel: (1) that "[w]e're not going to send a Taliban with a bomb [vest]" when Sami volunteered to be part of a team travelling

9

overseas,[6] (2) that Sami should "quit watching Middle Eastern porn" in order to improve as a doctor, and (3) that Sami had a "funny" accent.

The district court found that these statements did not constitute direct evidence of discrimination. We agree.

While these alleged comments are undoubtedly disturbing, "comments made by individuals who are not involved in the decision-making process regarding plaintiff's employment do not constitute direct evidence of discrimination." *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003) (citing *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 433 (6th Cir. 2002)). It is undisputed that Vigdorchik, Markel, and Lemos had no role in the final decision to terminate Sami. This decision was made by Deborah Kellogg, the corporate director of Graduate Medical Education at DMC, as well as three committee members[7] appointed by the Chair of the Graduate Medical Education Committee. Both Kellogg and the committee conducted separate investigations and reviews. The committee also held a hearing in which Sami was allowed to testify and rebut the charges against him. It was only following the conclusion of all of these procedures that Sami was terminated. As a result, because Markel and Vigdorchik were not the final decisionmakers with regard to Sami's termination, their statements cannot be considered direct evidence of national origin discrimination against Sami.

Moreover, even assuming Sami's evidence can be characterized as direct evidence, DMC meets its burden "to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Johnson*, 319 F.3d at 865 (internal quotation marks omitted). DMC lists numerous compelling reasons for terminating Sami: his failure to perform procedures correctly—to the point where one of his procedures was deemed "violent and

---

[6] The other doctors in the room at the time testified under oath that they never heard Markel say this.
[7] These three committee members were Wilhelmine Wiese-Rometsch, Beth Ann Brooks, and Therese Vettese.

10

unsafe,"—his contamination of a surgical rod and his subsequent attempt to insert that rod into a patient's bone, his lack of medical knowledge and inability to think critically about patients' diagnoses, and his failure to accept responsibility for his mistakes. An employer who has an obligation to the general public and prospective patients cannot tolerate unsafe employees. Thus, Sami's numerous unsafe surgical procedures[8] would have warranted his termination regardless of discriminatory animus.

B.

Sami also argues that DMC is liable for the discriminatory actions of Vigdorchik and Markel under the "cat's paw" theory of liability. A cat's paw theory of liability is that "a biased subordinate, who lacks decision-making power, influence[d] the unbiased decision-maker to make an adverse employment decision, thereby hiding the subordinate's discriminatory intent." *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 755 (6th Cir. 2012) (internal quotation marks and alteration omitted). There must be evidence of a "'causal nexus' between the ultimate decisionmaker's decision to terminate the plaintiff and the supervisor's discriminatory animus." *Romans v. Mich. Dept. of Human Servs.*, 668 F.3d 826, 836 (6th Cir. 2012) (quoting *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 677 (6th Cir. 2008)).

Sami urges this court to reverse and remand the district court's ruling on his discrimination claims "for factfinding to determine whether the employer DMC is at fault because one of its agents either of Drs. Vigdorchik or Markel committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision." However, the evidence belies a causal connection between any statements made by either doctor and Sami's termination.

---

[8] The above mentioned concerns are just some of many noted throughout Sami's probation, first hearing, and second hearing. For more, see *infra*, nn. 12 & 13.

11

He claims that the "record establishes that the actions of Drs. Vigdorchik and Markel were part of the causal link leading to Dr. Sami's termination." [9] Specifically, he notes that the first reason for the committee's ultimate decision came from the complaint circulated by Vigdorchik.

For one thing, although Sami accuses Vigdorchik of circulating a formal complaint about Sami, the complaint explicitly states "[t]his document has been compiled by the senior (3rd and 4th year) residents" of the DMC residency program. Indeed, Vigdochik's name is not among the five signatures typed at the end of the complaint. For another thing, even if Vigdorchik distributed the complaint, Sami's contention is entirely incorrect. Not one of the reasons cited by the committee in support of its final termination decision is the same as those found in the resident complaint Based on this evidence, it is clear that Vigdorchik's supposed animus did not cause Sami's termination.

Moreover, DMC conducted multiple independent investigations and judgments that break the causal chain between the doctors' alleged animus and DMC's decision to terminate Sami. While an independent judgment on the part of the employer is not a *per se* defense to a cat's paw theory of liability, the Supreme Court has determined that "if the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable." *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1193 (2011).

In this case, the committee's investigation determined that Sami's termination was justified. The ACGME also reviewed and upheld Sami's termination. Therefore, even if Vigdorchik and Markel's statements demonstrate a discriminatory animus toward Sami, the

_____

[9] Sami is not clear how Markel contributed to his termination. We assume it is because Markel allegedly caused Sami's ban from Providence Hospital.

12

committee's independent investigation into Sami's termination reveals that neither doctor used DMC as a cat's paw to accomplish their allegedly discriminatory aims.

IV.

Under Michigan law, to establish a *prima facie* case of tortious interference with a business relationship or expectancy, a plaintiff must demonstrate (1) "the existence of a valid business relationship or expectancy[;]" (2) "knowledge of the relationship or expectancy on the part of the defendant[;]" (3) "an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy[;]" and (4) "resultant damage to the plaintiff." *Kuhn v. Washtenaw Cnty*., 709 F.3d 612, 630–31 (6th Cir. 2013) (internal quotation marks omitted). Assuming he fulfilled the first two elements, Sami cannot establish that Markel's alleged interference induced or caused a termination of the relationship.

Sami alleges that there is a material factual dispute, and thus the district court's grant of summary judgment was inappropriate. Specifically, he contends that a material dispute exists as to whether or not Markel induced Providence to ban Sami based on false allegations that Sami was "dangerous." (Appellant's Br. 31.) This dispute is significant, Sami argues, because "Dr. Markel's representations caused the Providence Hospital ban, and the ban, in turn, was a significant factor in Dr. Sami's termination." (*Id.*) As evidenced in the record, this is simply not true.

According to Sami, this factual dispute stems from what he calls "the Marabanian incident." (Appellant's Br. 30.) Alicia Marabanian, a nurse anesthetist, reported Sami for what she deemed to be inappropriate behavior.[10] Following this incident, Sami confronted the nurse about reporting him. What happened after this conversation, however, is greatly contested.

---

[10] According to Marabanian, Sami yelled "code brown" when a patient had an involuntary bowel movement. Sami does not deny this.

13

Sami maintains that the conversation was amicable and "both parties went about their business." (Appellant's Br. 10.) Marabanian, on the other hand, claims that she felt threatened,[11] while the defendants allege that Sami "shouted angrily in her face" and "frightened her to the point she asked to be escorted to her car by security." Sami claims that this "lie" resulted in his termination.

Even assuming a factual dispute on the Marabanian incident, Sami's claim fails because the dispute is not *material*. A fact is material if it is necessary to resolve the claim. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment.").

If the Marabanian incident were the sole reason for Sami's termination, there may have been a material dispute for the jury. The problem here is the Marabanian incident was not a factor in Sami's termination. The committee's decision to terminate Sami never mentioned the Providence ban or any issues Dr. Sami may have had at Providence Hospital. In fact, despite being aware of Dr. Sami's ban from Providence, the corrective action committee decided against terminating Sami, "extend[ing] one final opportunity to Dr. Sami to remain in the Program . . . ."

Following Sami's probationary period, OREC reviewed his progress and "unanimously believe[d] that ample evidence exist[ed] to support" Sami's termination. OREC founded its recommendation on numerous incidents; Sami's ban from Providence, however, was noticeably absent from OREC's considerations.[12] After a hearing and review, the corrective action

---

[11] The fact that she felt threatened is noticeably absent from her initial written report.

[12] OREC listed the following concerns:

(1) Dr. Sami failed to correctly interpret radiologic studies and corresponding surgical procedures . . . .

(2) In a surgery involving hardware removal from an ankle, Dr. Sami was not allowed to continue on a case as he was injuring a patient with an unsafe dissection. . . . As a result of Dr. Sami's poor performance, the attending physician ordered Dr. Sami to stop the case. . . ."

committee found that the "continuing evidence of [Sami's] unsatisfactory performance" warranted his termination from the program. Notably, the reasons cited by the committee focused entirely on incidents that occurred during Sami's probation and were wholly unrelated to Sami's ban from Providence.[13] As a result of the findings, both the chief medical officer of DMC and ACGME upheld Sami's termination. Clearly, based on these facts, Markel's alleged tortious interference neither induced nor caused Sami's termination.

V.

Under Michigan law, a claim for tortious interference with contract has three elements: "(1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Gardner v. Heartland Indus. Partners, LP*, 715 F.3d 609, 614 (6th Cir. 2013) (internal quotation marks omitted). The parties do not dispute that a contract existed, but Sami has failed to prove either the second or third element.

As with his tortious interference claim, Sami argues that the district court erred by granting summary judgment because of a material factual dispute about the Marabanian incident, and Markel's involvement in Sami's ban from Providence Hospital.

During the district court's assessment of Sami's breach of contract claim, it determined that Sami's contract with DMC was not breached. Sami's appellate brief does not contain any argument at to why the district court's dismissal of his breach of contract claim was improper;

---

(3) Dr. Sami failed to conduct a pre-operative examination on a patient . . . [which] is required to avoid complications such as permanent neurologic damage. . . . On a subsequent procedure, . . . Dr. Sami failed to perform irrigation and debridement of the open fracture first. During dissection Dr. Sami was asked to stop the procedure as he failed to recognize that he could injure [the patient]. He had no knowledge of the anatomy or correct procedure and allowing him to continue would have resulted in harm, and unsafe care for the child. This type of mistake should never occur with a resident at his level of training.

Although not an exhaustive list, these issues are severe. It is understandable that a residency program, in which caring for patients is a priority, would find Sami's termination necessary for the safety of its patients.

[13] Some of these reasons included "serious patient care issues," "Dr. Sami's 'violent and unsafe' dissection [of an ankle]," and "lack of critical thinking skills."

15

thus, he has waived this issue and the determination of the district court is controlling. *Wilson v. Todd*, 53 F. App'x 744, 746 (6th Cir. 2002) ("The failure to present an argument in an appellate brief waives appellate review.").

## VI.

Finally, Sami argues that if the court overturns the district court's grant of summary judgment on any of his claims, it should reverse the court's dismissal of the conspiracy claim. Because this court does not overturn any of the district court's rulings, the record does not support the claims underlying Sami's conspiracy allegation.

## VII.

For the foregoing reasons, the grant of summary judgment to the defendants is affirmed.