[Cite as *Stallworth v. Wal-Mart Stores E., L.P.*, 2016-Ohio-2620.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

|  |  |  |
|---|---|---|
| MARLOW STALLWORTH, | : | APPEAL NO. C-150355 |
|  |  | TRIAL NO. A-1405383 |
| Complainant-Appellee, | : |  |
|  |  | *O P I N I O N.* |
| vs. | : |  |
| WAL-MART STORES EAST, L.P., | : |  |
| Respondent-Appellant. | : |  |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: April 22, 2016

*Mike DeWine*, Ohio Attorney General, *Megan M. Hudson* and *Stefan J. Schmidt*, Assistant Attorneys General, for Complainant-Appellee,

*Littler Mendelson, P.C.*, *Alison M. Day* and *Erik Hult*, for Respondent-Appellant.

Please note: this case has been removed from the accelerated calendar.

**Sylvia S. Hendon, Presiding Judge.**

{¶1}   This is a racial-discrimination case.  Respondent-appellant Wal-Mart Stores East, L.P., ("Wal-Mart") has appealed from the trial court's entry ordering Wal-Mart to comply with a cease-and-desist order issued by the Ohio Civil Rights Commission ("Commission") on behalf of complainant-appellee Marlow Stallworth. Because the trial court did not abuse its discretion in ordering compliance with the cease-and-desist order, we affirm its judgment.

### *Facts and Procedure*

{¶2}   Stallworth began working as a third-shift overnight stocker at a Wal-Mart store in Hawaii in September of 1997.  In April of 2008, he transferred to a Wal-Mart store in Cincinnati.  He was the only African-American overnight stocker at the store.  As an overnight stocker, Stallworth's responsibilities included receiving merchandise and stocking it on the shelves, putting away overstock, and zoning, or straightening, the aisles.  His normal shift hours were from 10:00 p.m. to 7:00 a.m.

{¶3}   In April of 2009, Chris McDaniel, an assistant manager at Wal-Mart, became one of Stallworth's supervisors.  The two worked together approximately three to four nights a week.  The relationship between McDaniel and Stallworth was contentious from the beginning.  During their first interaction, McDaniel was argumentative with Stallworth after finding that, approximately 30 minutes after his shift had ended, Stallworth still had two pallets of merchandise left to stock. McDaniel ordered Stallworth to stay until the pallets were unloaded, but Stallworth had family responsibilities and could not continue to work overtime.  McDaniel told

Stallworth that he did not like his attitude, and that Stallworth should not return to work if he did not finish the pallets before he left.

{¶4} The relationship between McDaniel and Stallworth continued to deteriorate. McDaniel would confront Stallworth in his aisle and tell him that he was lazy and not performing up to standards, but McDaniel did not similarly criticize the Caucasian stockers about their productivity. McDaniel would also overload Stallworth with work by bringing out all of the overstock for his aisle, even if not needed on the floor. Stallworth reported McDaniel's harassing behavior to another manager and was told that the problem would be taken care of. But, according to Stallworth, McDaniel then became more aggressive. After Stallworth told McDaniel that he wanted their conversations to be limited to work-related matters, McDaniel responded by saying "the way you people think is dumb."

{¶5} On May 25, 2009, McDaniel confronted Stallworth near the end of his shift about Stallworth's failure to zone his aisle that night. Stallworth had been given permission from store manager Quinton Wilson to leave his shift thirty minutes early, and he informed McDaniel that he would not be able to complete the zoning and asked for help from another stocker. It was common store practice to have workers with less freight on a particular night assist those who had heavier loads. While McDaniel often provided extra workers to assist Caucasian stockers with heavy loads, he refused to do so for Stallworth. Stallworth stated that he would not stay to zone his aisle, and the two men engaged in a loud argument that continued into a backroom before Stallworth left the store.

{¶6} The next shift that Stallworth and McDaniel worked together occurred on May 30, 2009. That day, McDaniel asked Stallworth to come into a back office for

3

a meeting to discuss their earlier argument. Lucinda Nause, another assistant manager, sat in on the meeting. McDaniel informed Stallworth of his expectations, and then told Stallworth that he had intended to give him a coaching, a form of discipline at Wal-Mart, but that he had been instructed not to. After McDaniel showed Stallworth the coaching that he had prepared, Stallworth lost his temper, called McDaniel stupid and dumb, and walked out of the meeting. He then reported McDaniel's behavior to Chris Mitchell, a co-manager at that Wal-Mart location.

{¶7} Mitchell held a meeting with both Stallworth and McDaniel. He told the men that they were going to have a fresh start and instructed them to shake hands, which they did. Stallworth then left to begin a previously scheduled two-week vacation. Immediately thereafter, McDaniel approached Mitchell and told him that he had not been told the full version of what had happened during the earlier meeting between him, Nause, and Stallworth. McDaniel then told Mitchell that Stallworth had called him "fucking stupid and dumb." While on vacation, Stallworth received a call from Wal-Mart telling him not to return to work, but to attend a meeting that had been scheduled for June 13, 2009. At that meeting, Wal-Mart co-manager Michael Spencer and another assistant manager accused Stallworth of calling McDaniel "fucking stupid and dumb" during the meeting on May 30, and informed him that he was fired because such disrespect of managers would not be tolerated. After being fired, Stallworth repeatedly called Wal-Mart in an attempt to get his job back.

{¶8} On June 14, 2009, Stallworth returned to Wal-Mart and circulated a petition among the overnight stockers. The petition read as follows:

We, the associates at 1443 Wal-Mart, support Marlow Stallworth. He is a hard and dependable worker which was being harassed by Assistant Manager Chris on numerous occasions. He was spoken to in a disrespectful manner and told not to come to work on several occasions.

Nineteen workers signed his petition.

{¶9} On June 17, 2009, Stallworth received a call from Quinton Wilson. Wilson told him that he could return to work on his next scheduled shift, but that he would receive a coaching. Stallworth returned to work, but did not receive a decision-day coaching until mid-July 2009. In a decision-day coaching, the recipient of the coaching is given a paid day off work and is instructed to write a plan of action explaining how the employee's behavior will change. If the plan of action is deemed acceptable, the employee is permitted to return to work. Stallworth refused to sign the decision-day coaching and was sent home according to policy. He returned the following day and submitted his plan of action to assistant manager Rowena DeHart. She told Stallworth that she did not know if it would be deemed acceptable.

{¶10} After submitting his plan of action, Stallworth went home. He continually called Wal-Mart to inquire about his job. On July 14, 2009, he was told by assistant manager Melissa Grimsley that he could not return to work. Notwithstanding this, Wal-Mart continued to keep Stallworth on the work schedule as an employee through July 30, 2009.

{¶11} On July 16, 2009, Stallworth filed a charge of racial discrimination against Wal-Mart with the Ohio Civil Rights Commission. After finding probable cause that Wal-Mart had engaged in discriminatory practices, the commission filed a

complaint alleging that Wal-Mart had subjected Stallworth to different terms and conditions of employment based on his race, in violation of R.C. 4112.02. A hearing on Stallworth's complaint was held before an administrative law judge.

{¶12} Stallworth testified about the conditions of his employment and his history with McDaniel. The Commission presented additional testimony from Robert Morgan, who had worked as an overnight stocker at Wal-Mart in an aisle shared with Stallworth. Morgan testified that although Stallworth was a hard worker, McDaniel never seemed to have a nice word for him, was always on his case, and scrutinized Stallworth more than other workers who were not as productive, including Morgan himself. Morgan explained that McDaniel was disliked by a large percentage of those he supervised. In addition, Morgan mentioned an incident in which Stallworth had climbed up into the store racks and McDaniel had stated to him, "You're up there. You look like a monkey. You don't need to be up in those racks. It's unsafe."

{¶13} William DeMoss, a Pepsi merchandiser who worked at Wal-Mart, likewise testified that he had worked in the aisle next to Stallworth and that McDaniel had scrutinized Stallworth more than other workers on that shift who did not work as hard as Stallworth.

{¶14} Assistant manager Rowena DeHart testified that Stallworth was a great worker who always completed his work. She explained that McDaniel was never satisfied or pleased with Stallworth's work, and that he treated Stallworth differently than other associates. DeHart did not care for McDaniel as a manager because he would not give people help and would give extra work to a person who already had too much.

{¶15} Wal-Mart presented testimony from Chris McDaniel. McDaniel explained that he had at times refused to provide extra workers to help Stallworth because he believed that Stallworth should have been able to complete the assigned work on his own. With respect to the argument that occurred on May 25, McDaniel testified that Stallworth had been "shooting the breeze" with another employee when he had asked him to finish zoning the aisle. After Stallworth responded with attitude, McDaniel wrote up a coaching for him. But McDaniel decided not to submit the coaching and to have a meeting with Stallworth instead. McDaniel testified that during the May 30 meeting, he had first apologized to Stallworth and expressed that he wanted to start fresh. But he later decided to give the coaching to Stallworth because Stallworth had been belligerent, had refused to take any responsibility for their disagreement, and had called him "fucking stupid and dumb." Lucinda Nause, who had witnessed the May 30 meeting, testified that Stallworth had called McDaniel "fucking stupid and dumb."

{¶16} Wal-Mart also presented testimony from Quinton Wilson. Wilson had reviewed Stallworth's plan of action and had deemed it unacceptable because Stallworth had refused to take responsibility for his actions and had denied swearing at McDaniel. Wilson had instructed an assistant to inform Stallworth that he could submit a revised plan of action. But he could not remember which assistant he had given that instruction to, and he did not know if his instruction had actually been conveyed to Stallworth, who had not submitted a revised plan of action. Wilson explained that Stallworth's employment had not been terminated because of the decision-day coaching or plan of action, but that Stallworth had been "voluntarily

terminated" for a failure to show up for work for three days without calling in after his plan of action was not accepted.

{¶17} Following the hearing, the administrative law judge found that Wal-Mart had been motivated by an illegal discriminatory animus and that Stallworth was entitled to relief as a matter of law. The Commission adopted the administrative law judge's report and issued a cease-and-desist order to Wal-Mart. Specifically, the Commission ordered Wal-Mart to stop all discriminatory practices in violation of R.C. Chapter 4112, make a timely offer of employment to Stallworth for the position of third-shift stocker, and issue a check for back pay to Stallworth in the amount of $99,199.48.

{¶18} Wal-Mart filed a petition for judicial review of the Commission's order with the Hamilton County Court of Common Pleas. The trial court ordered Wal-Mart to comply with the Commission's cease-and-desist order.

### *Standard of Review*

{¶19} Pursuant to R.C. 4112.06(E), when reviewing a final order issued by the Commission, the trial court must affirm the Commission's order if it was supported by reliable, probative and substantial evidence. *See Bd. of Edn. v. Ohio Civ. Rights Comm.*, 1st Dist. Hamilton No. C-990259, 2000 Ohio App. LEXIS 5850, *6-7 (Dec. 15, 2000).

{¶20} This court's review is more limited. We must determine whether the trial court abused its discretion in finding that the Commission's order was supported by reliable, probative, and substantial evidence. *See Ohio Civ. Rights Comm. v. Case W. Reserve Univ.*, 76 Ohio St.3d 168, 177, 666 N.E.2d 1376 (1996). An abuse of discretion connotes more than an error of law or judgment, and it

implies that the trial court's decision was arbitrary, unreasonable, or unconscionable. *Pembaur v. Leis*, 1 Ohio St.3d 89, 91, 437 N.E.2d 1199 (1982).

{¶21} Wal-Mart argues in its first assignment of error that the trial court erred by failing to provide any support in law or from the record for its judgment. We find no merit to this argument. The trial court clearly indicated in its entry that it was reviewing the Commission's cease-and-desist order to determine whether there was reliable, probative and substantial evidence to support the administrative law judge's decision. And it is clear from the record that the trial court had reviewed the proceedings below. The trial court stated that although it probably would have weighed the evidence differently, there was reliable, probative, and substantial evidence to support the administrative law judge's interpretation of the evidence. Further, there is no requirement in R.C. 4112.06 that the trial court specifically address every argument raised before it.

{¶22} The first assignment of error is overruled.

### *Prima Facie Case of Discrimination*

{¶23} In its second assignment of error, Wal-Mart argues that the trial court erred by failing to determine that there was no reliable, probative, and substantial evidence to establish a prima facie case of discrimination.

{¶24} Stallworth's complaint charged that Wal-Mart had discriminated against him on the basis of his race in violation of R.C. 4112.02(A). This statute provides that it is an unlawful and discriminatory practice

> For any employer, because of the race, color, religion, sex, military
> status, national origin, disability, age, or ancestry of any person, to
> discharge without just cause, to refuse to hire, or otherwise to

9

discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

{¶25} A burden-shifting analysis is used to determine whether an employer engaged in a discriminatory practice prohibited by R.C. 4112.02. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In the first step of this analysis, the plaintiff bears the burden of proving a prima facie case of discrimination by a preponderance of the evidence. *Id.* at 253. If the plaintiff meets that burden, the burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for the employee's termination or other adverse employment action. *Id.* In the last step of the analysis, the burden shifts back to the plaintiff to establish by a preponderance of the evidence that the legitimate reason proffered by the defendant was a mere pretext for discrimination. *Id.*

{¶26} A plaintiff may establish a prima facie case of discrimination in one of two ways. First, the plaintiff may present direct evidence of discrimination. *See Mauzy v. Kelly Servs.*, 75 Ohio St.3d 578, 587, 664 N.E.2d 1272 (1996). Or, a plaintiff may establish a prima facie case of discrimination by showing (1) that he is a member of a racial minority or protected class; (2) that he was qualified for the position; (3) that he suffered an adverse employment action or that his employment was terminated; and (4) that similarly-situated nonprotected employees were treated differently. *Greene v. Cincinnati*, 1st Dist. Hamilton No. C-070830, 2008-Ohio-4908, ¶ 17; *Burdine* at 253.

{¶27} With respect to this latter element necessary to establish a prima facie case, a plaintiff need not demonstrate an exact correlation with the similarly-situated employee. *Greene* at ¶ 18. It is sufficient to show that each had the same supervisor, had been subjected to the same standards, and had engaged in the same conduct without differentiating or mitigating circumstances. *Id.*; *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir.1998).

{¶28} Wal-Mart argues that Stallworth failed to establish a prima facie case of discrimination because the record did not demonstrate that a similarly-situated nonprotected employee had been treated differently. Wal-Mart does not challenge any other findings regarding the burden-shifting analysis. Specifically, Wal-Mart compares Stallworth to other employees who had used profanity in the workplace. It argues that because Stallworth had directed his profanity at a supervisor, he was not similarly situated to any other employees who had used profanity at work. However, the administrative law judge specifically found that Stallworth had not used profanity during his meeting with McDaniel and Nause, and this finding was supported by the record. Notwithstanding this finding, the allegations of profanity become irrelevant because Stallworth established the last element of his prima facie case by comparing himself to a broader class, the overnight stockers at Wal-Mart. The administrative law judge had found that McDaniel had treated Stallworth less favorably than similarly situated Caucasian overnight stockers.

{¶29} Stallworth was the only African-American overnight stocker at Wal-Mart. All overnight stockers were subjected to the same standards and responsibilities, and all were supervised by McDaniel. Stallworth testified in detail

regarding McDaniel's treatment of him, including McDaniel's refusal to provide Stallworth with additional help that he would provide to Caucasian stockers.

{¶30} Corroborating testimony was presented from a supervisor and other employees. Former overnight stocker Robert Morgan testified that McDaniel had scrutinized Stallworth more than the other employees who did not perform as efficiently as Stallworth, and that McDaniel was "always on Stallworth's case." Likewise, William DeMoss testified that McDaniel would scrutinize Stallworth more than other third-shift workers who would "screw off." Assistant Manager Rowena DeHart testified that Stallworth was a great worker, but that McDaniel was never satisfied with his work. She further testified that McDaniel did not treat other overnight stockers in the same manner. Morgan, DeMoss, and DeHart all testified that they believed McDaniel had treated Stallworth differently because he was African-American.

{¶31} Because the record contained reliable, probative and substantial evidence that Stallworth had been treated differently and had been subjected to different conditions of employment than similarly-situated Caucasian overnight stockers, the trial court did not abuse its discretion in finding that Stallworth had established a prima facie case of discrimination. The second assignment of error is overruled.

### *"Cat's Paw" Liability*

{¶32} In its third assignment of error, Wal-Mart argues that the trial court erred in failing to conclude that there was no evidence to support the Commission's finding of "cat's paw" liability.

{¶33} A "cat's paw" is "a person used by another to accomplish the other's purposes." *Smith v. Ohio Dept. of Pub. Safety*, 2013-Ohio-4210, 997 N.E.2d 597, ¶ 55 (10th Dist.). In an employment context, a "cat's paw" is an unbiased supervisor with decision-making ability who is influenced, or used as a dupe, by a biased subordinate without decision-making ability to facilitate a discriminatory employment action. *Id.* "Cat's paw" liability may be imposed on an employer when "one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision." *Staub v. Proctor Hosp.*, 562 U.S. 411, 421, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011).

{¶34} In this case, the Commission adopted the administrative law judge's finding that Quinton Wilson, the ultimate decision-maker in Stallworth's firing, had been motivated by McDaniel's discriminatory animus and had been a "cat's paw." The Commission found that the decision to issue a decision-day coaching to Stallworth had been based on McDaniel's statements that Stallworth had used profanity and had been insubordinate towards him during the May 30 meeting. It further found Stallworth had not in fact been insubordinate and had not used profanity.

{¶35} We have already discussed the evidence in the record pertaining to McDaniel's discriminatory animus. We now consider whether that animus led to Stallworth's firing. Wal-Mart contends that Stallworth was fired not because of McDaniel's statements, but rather that his employment was "voluntarily terminated" on July 30, 2009, because he had failed to show up for work for three days without calling in. The administrative law judge specifically rejected this argument after finding that a Wal-Mart employee had told Stallworth on July 14 that he could not

return to work and that Stallworth had repeatedly called from that date on in an attempt to have his employment reinstated. That finding was supported by reliable, probative, and substantial evidence, as was the judge's finding that Stallworth had not used profanity or been insubordinate in his meeting with McDaniel. Stallworth denied using profanity in the meeting. And in a report written after the meeting, McDaniel did not include any statements indicating that Stallworth had used profanity. During the administrative hearing, McDaniel attempted to explain that omission by testifying that he had purposely not included it in his report because it would have been inappropriate. But McDaniel also failed to inform co-manager Chris Mitchell that Stallworth had directed profanity towards him during the meeting that Mitchell had initiated shortly after the incident. It was not until Stallworth left the meeting that McDaniel informed Mitchell about Stallworth's use of profanity.

{¶36} The decision to ultimately terminate his employment was based on McDaniel's allegation, motivated by a racial animus and found by the administrative law judge to be false, that Stallworth had used profanity and had been insubordinate. Consequently, we hold that the trial court did not abuse its discretion by failing to find that there was no evidence to support the Commission's finding of "cat's paw" liability.

{¶37} The third assignment of error is overruled.

### *Mitigation of Damages*

{¶38} In its fourth assignment of error, Wal-Mart contends that the trial court erred in failing to conclude that Stallworth had not met his statutory duty to

mitigate his damages. The Commission had awarded Stallworth $99,199.48 in back pay.

{¶39} Stallworth testified at the administrative hearing that he began looking for employment approximately two months after he was terminated by Wal-Mart. His fiancé helped him apply for jobs, but few were available because of a recession at the time. He had applied for employment at Kroger, K-Mart, UDF, Best Buy, DHL, and as a dietary aide. Stallworth was able to obtain part-time seasonal employment at Best Buy in late 2010. Around the same time he also obtained part-time employment with DHL, working 20 hours a week. He did not continue to look for additional employment while working at DHL because he had hoped to be hired on full time. Stallworth voluntarily left DHL in the end of 2011 because his family had become homeless, and they were unable to qualify for cash assistance when he was employed.

{¶40} Wal-Mart contends that the Commission's award of back pay was an abuse of discretion because Stallworth had failed to mitigate his damages by looking for alternative employment. Stallworth did have a duty to attempt to mitigate his damages by looking for employment substantially equivalent to that which he had been terminated from. *See Jordan v. Ohio Civ. Rights Comm.*, 173 Ohio App.3d 87, 2007-Ohio-3830, 877 N.E.2d 693, ¶ 43 (12th Dist.). But the failure to mitigate damages is an affirmative defense that may be asserted by an employer. *See Finch v. Xavier Univ.*, 689 F.Supp.2d 955, 969 (S.D.Ohio 2010). To establish that Stallworth had failed to mitigate damages, Wal-Mart had to show that substantially-equivalent positions had been available, and that Stallworth had failed to use due diligence

when seeking out those positions. *See Hollingsworth v. Time Warner Cable*, 168 Ohio App.3d 658, 2006-Ohio-4903, 861 N.E.2d 580, ¶ 69 (1st Dist.).

{**¶41**} Wal-Mart did not meet its burden. It introduced no evidence of any substantially-equivalent positions that had been available at the time that Stallworth had been looking for employment. Consequently, we hold that the trial court did not abuse its discretion in failing to find that Stallworth had not mitigated his damages.

{**¶42**} The fourth assignment of error is overruled, and the judgment of the trial court is affirmed.

Judgment affirmed.

**CUNNINGHAM** and **DEWINE, JJ.,** concur.

Please note:
> The court has recorded its own entry on the date of the release of this opinion.