(Slip Opinion) OCTOBER TERM, 2010 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## STAUB *v.* PROCTOR HOSPITAL

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 09–400.   Argued November 2, 2010—Decided March 1, 2011

While employed as an angiography technician by respondent Proctor Hospital, petitioner Staub was a member of the United States Army Reserve.  Both his immediate supervisor (Mulally) and Mulally's supervisor (Korenchuk) were hostile to his military obligations.  Mulally gave Staub disciplinary warning which included a directive requiring Staub to report to her or Korenchuk when his cases were completed.  After receiving a report from Korenchuk that Staub had violated the Corrective Action, Proctor's vice president of human resources (Buck) reviewed Staub's personnel file and decided to fire him.  Staub filed a grievance, claiming that Mulally had fabricated the allegation underlying the warning out of hostility toward his military obligations, but Buck adhered to her decision.  Staub sued Proctor under the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), which forbids an employer to deny "employment, reemployment, retention in employment, promotion, or any benefit of employment" based on a person's "membership" in or "obligation to perform service in a uniformed service," 38 U. S. C. §4311(a), and provides that liability is established "if the person's membership . . . is a motivating factor in the employer's action," §4311(c).  He contended not that Buck was motivated by hostility to his military obligations, but that Mulally and Korenchuk were, and that their actions influenced Buck's decision.  A jury found Proctor liable and awarded Staub damages, but the Seventh Circuit reversed, holding that Proctor was entitled to judgment as a matter of law because the decisionmaker had relied on more than Mulally's and Korenchuk's advice in making her decision.

*Held*:

1. If a supervisor performs an act motivated by antimilitary ani-

mus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA. In construing the phrase "motivating factor in the employer's action," this Court starts from the premise that when Congress creates a federal tort it adopts the background of general tort law. See, *e.g., Burlington N. & S. F. R. Co.* v. *United States,* 556 U. S. ___, ___. Intentional torts such as the one here "generally require that the actor intend 'the consequences' of an act,' not simply 'the act itself.' " *Kawaauhau* v. *Geiger*, 523 U. S. 57, 61–62. However, Proctor errs in contending that an employer is not liable unless the *de facto* decisionmaker is motivated by discriminatory animus. So long as the earlier agent intended, for discriminatory reasons, that the adverse action occur, he has the scienter required for USERRA liability. Moreover, it is axiomatic under tort law that the decisionmaker's exercise of judgment does not prevent the earlier agent's action from being the proximate cause of the harm. See *Hemi Group, LLC* v. *City of New York*, 559 U. S. 1, ___. Nor can the ultimate decisionmaker's judgment be deemed a superseding cause of the harm. See *Exxon Co., U. S. A.* v. *Sofec, Inc.,* 517 U. S. 830, 837. Proctor's approach would have an improbable consequence: If an employer isolates a personnel official from its supervisors, vests the decision to take adverse employment actions in that official, and asks that official to review the employee's personnel file before taking the adverse action, then the employer will be effectively shielded from discriminatory acts and recommendations of supervisors that were designed and intended to produce the adverse action. Proctor also errs in arguing that a decisionmaker's independent investigation, and rejection, of an employee's discriminatory animus allegations should negate the effect of the prior discrimination. Pp. 4–10.

2. Applying this analysis here, the Seventh Circuit erred in holding that Proctor was entitled to judgment as a matter of law. Both Mulally and Korenchuk acted within the scope of their employment when they took the actions that allegedly caused Buck to fire Staub. There was also evidence that their actions were motivated by hostility toward Staub's military obligations, and that those actions were causal factors underlying Buck's decision. Finally, there was evidence that both Mulally and Korenchuk had the specific intent to cause Staub's termination. The Seventh Circuit is to consider in the first instance whether the variance between the jury instruction given at trial and the rule adopted here was harmless error or should mandate a new trial. Pp. 11–12.

560 F. 3d 647, reversed and remanded.

Syllabus

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. ALITO, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined. KAGAN, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 09–400

_____

## VINCENT E. STAUB, PETITIONER *v.* PROCTOR HOSPITAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[March 1, 2011]

JUSTICE SCALIA delivered the opinion of the Court.

We consider the circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision.

I

Petitioner Vincent Staub worked as an angiography technician for respondent Proctor Hospital until 2004, when he was fired. Staub and Proctor hotly dispute the facts surrounding the firing, but because a jury found for Staub in his claim of employment discrimination against Proctor, we describe the facts viewed in the light most favorable to him.

While employed by Proctor, Staub was a member of the United States Army Reserve, which required him to attend drill one weekend per month and to train full time for two to three weeks a year. Both Janice Mulally, Staub's immediate supervisor, and Michael Korenchuk, Mulally's supervisor, were hostile to Staub's military obligations. Mulally scheduled Staub for additional shifts without

notice so that he would "'pa[y] back the department for everyone else having to bend over backwards to cover [his] schedule for the Reserves.'"    560 F. 3d 647, 652 (CA7 2009).   She also informed Staub's co-worker, Leslie Sweborg, that Staub's "'military duty had been a strain on th[e] department,'" and asked Sweborg to help her "'get rid of him.'"  *Ibid.*  Korenchuk referred to Staub's military obligations as "'a b[u]nch of smoking and joking and [a] waste of taxpayers['] money.'"  *Ibid.*  He was also aware that Mulally was "'out to get'" Staub.  *Ibid.*

In January 2004, Mulally issued Staub a "Corrective Action" disciplinary warning for purportedly violating a company rule requiring him to stay in his work area whenever he was not working with a patient.  The Corrective Action included a directive requiring Staub to report to Mulally or Korenchuk "'when [he] ha[d] no patients and [the angio] cases [we]re complete[d].'"  *Id.,* at 653.  According to Staub, Mulally's justification for the Corrective Action was false for two reasons: First, the company rule invoked by Mulally did not exist; and second, even if it did, Staub did not violate it.

On April 2, 2004, Angie Day, Staub's co-worker, complained to Linda Buck, Proctor's vice president of human resources, and Garrett McGowan, Proctor's chief operating officer, about Staub's frequent unavailability and abruptness.  McGowan directed Korenchuk and Buck to create a plan that would solve Staub's "'availability' problems." *Id.,* at 654.  But three weeks later, before they had time to do so, Korenchuk informed Buck that Staub had left his desk without informing a supervisor, in violation of the January Corrective Action.   Staub now contends this accusation was false: he had left Korenchuk a voice-mail notification that he was leaving his desk.  Buck relied on Korenchuk's accusation, however, and after reviewing Staub's personnel file, she decided to fire him.  The termination notice stated that Staub had ignored the directive

issued in the January 2004 Corrective Action.

Staub challenged his firing through Proctor's grievance process, claiming that Mulally had fabricated the allegation underlying the Corrective Action out of hostility toward his military obligations. Buck did not follow up with Mulally about this claim. After discussing the matter with another personnel officer, Buck adhered to her decision.

Staub sued Proctor under the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U. S. C. §4301 *et seq.,* claiming that his discharge was motivated by hostility to his obligations as a military reservist. His contention was not that Buck had any such hostility but that Mulally and Korenchuk did, and that their actions influenced Buck's ultimate employment decision. A jury found that Staub's "military status was a motivating factor in [Proctor's] decision to discharge him," App. 68a, and awarded $57,640 in damages.

The Seventh Circuit reversed, holding that Proctor was entitled to judgment as a matter of law. 560 F. 3d 647. The court observed that Staub had brought a "'cat's paw' case," meaning that he sought to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision. *Id.,* at 655–656.[1] It explained that under Seventh Circuit precedent, a "cat's paw" case could not succeed unless the nondecision-maker exercised such "'singular influence'" over the deci-

---

[1] The term "cat's paw" derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Posner in 1990. See *Shager* v. *Upjohn Co.*, 913 F. 2d 398, 405 (CA7). In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward.

sionmaker that the decision to terminate was the product of "blind reliance." *Id.,* at 659. It then noted that "Buck looked beyond what Mulally and Korenchuk said," relying in part on her conversation with Day and her review of Staub's personnel file. *Ibid.* The court "admit[ted] that Buck's investigation could have been more robust," since it "failed to pursue Staub's theory that Mulally fabricated the write-up." *Ibid.* But the court said that the "'singular influence'" rule "does not require the decisionmaker to be a paragon of independence": "It is enough that the decisionmaker is not wholly dependent on a single source of information and conducts her own investigation into the facts relevant to the decision." *Ibid.* (internal quotation marks omitted). Because the undisputed evidence established that Buck was not wholly dependent on the advice of Korenchuk and Mulally, the court held that Proctor was entitled to judgment. *Ibid.*

We granted certiorari. 559 U. S. ___ (2010).

## II

The Uniformed Services Employment and Reemployment Rights Act (USERRA) provides in relevant part as follows:

"A person who is a member of . . . or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, . . . or obligation." 38 U. S. C. §4311(a).

It elaborates further:

"An employer shall be considered to have engaged in actions prohibited . . . under subsection (a), if the person's membership . . . is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of

such membership." §4311(c).

The statute is very similar to Title VII, which prohibits employment discrimination "because of . . . race, color, religion, sex, or national origin" and states that such discrimination is established when one of those factors "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U. S. C. §§2000e–2(a), (m).

The central difficulty in this case is construing the phrase "motivating factor in the employer's action." When the company official who makes the decision to take an adverse employment action is personally acting out of hostility to the employee's membership in or obligation to a uniformed service, a motivating factor obviously exists. The problem we confront arises when that official has no discriminatory animus but is influenced by previous company action that is the product of a like animus in someone else.

In approaching this question, we start from the premise that when Congress creates a federal tort it adopts the background of general tort law. See *Burlington N. & S. F. R. Co.* v. *United States*, 556 U. S. \_\_\_, \_\_\_ (2009) (slip op., at 13–14); *Safeco Ins. Co. of America* v. *Burr*, 551 U. S. 47, 68–69 (2007); *Burlington Industries, Inc.* v. *Ellerth*, 524 U. S. 742, 764 (1998). Intentional torts such as this, "as distinguished from negligent or reckless torts, . . . generally require that the actor intend 'the *consequences*' of an act,' not simply 'the act itself.'" *Kawaauhau* v. *Geiger*, 523 U. S. 57, 61–62 (1998).

Staub contends that the fact that an unfavorable entry on the plaintiff's personnel record was caused to be put there, with discriminatory animus, by Mulally and Korenchuk, suffices to establish the tort, even if Mulally and Korenchuk did not intend to cause his dismissal. But discrimination was no part of Buck's reason for the dis-

missal; and while Korenchuk and Mulally acted with
discriminatory animus, the act they committed—the mere
making of the reports—was not a denial of "initial em-
ployment, reemployment, retention in employment, pro-
motion, or any benefit of employment," as liability under
USERRA requires. If dismissal was not the object of
Mulally's and Korenchuk's reports, it may have been
their result, or even their foreseeable consequence, but
that is not enough to render Mulally or Korenchuk
responsible.

Here, however, Staub is seeking to hold liable not Mu-
lally and Korenchuk, but their employer. Perhaps, there-
fore, the discriminatory motive of one of the employer's
agents (Mulally or Korenchuk) can be aggregated with the
act of another agent (Buck) to impose liability on Proctor.
Again we consult general principles of law, agency law,
which form the background against which federal tort
laws are enacted. See *Meyer* v. *Holley*, 537 U. S. 280, 285
(2003); *Burlington*, *supra*, at 754–755. Here, however, the
answer is not so clear. The Restatement of Agency sug-
gests that the malicious mental state of one agent cannot
generally be combined with the harmful action of another
agent to hold the principal liable for a tort that requires
both. See Restatement (Second) Agency §275, Illustration
4 (1958). Some of the cases involving federal torts apply
that rule. See *United States* v. *Science Applications Int'l
Corp.*, 626 F. 3d 1257, 1273–1276 (CADC 2010); *Chaney* v.
*Dreyfus Service Corp.*, 595 F. 3d 219, 241 (CA5 2010);
*United States* v. *Philip Morris USA Inc.*, 566 F. 3d 1095,
1122 (CADC 2009). But another case involving a federal
tort, and one involving a federal crime, hold to the con-
trary. See *United States ex rel. Harrison* v. *Westinghouse
Savannah River Co.*, 352 F. 3d 908, 918–919 (CA4 2003);
*United States* v. *Bank of New England, N. A.*, 821 F. 2d
844, 856 (CA1 1987). Ultimately, we think it unnecessary
in this case to decide what the background rule of agency

law may be, since the former line of authority is suggested by the governing text, which requires that discrimination be "a motivating factor" *in the adverse action.* When a decision to fire is made with no unlawful animus on the part of the firing agent, but partly on the basis of a report prompted (unbeknownst to that agent) by discrimination, discrimination might perhaps be called a "factor" or a "causal factor" in the decision; but it seems to us a considerable stretch to call it "a motivating factor."

Proctor, on the other hand, contends that the employer is not liable unless the *de facto* decisionmaker (the technical decisionmaker or the agent for whom he is the "cat's paw") is motivated by discriminatory animus. This avoids the aggregation of animus and adverse action, but it seems to us not the only application of general tort law that can do so. Animus and responsibility for the adverse action can both be attributed to the earlier agent (here, Staub's supervisors) if the adverse action is the intended consequence of that agent's discriminatory conduct. So long as the agent intends, for discriminatory reasons, that the adverse action occur, he has the scienter required to be liable under USERRA. And it is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm. Proximate cause requires only "some direct relation between the injury asserted and the injurious conduct alleged," and excludes only those "link[s] that are too remote, purely contingent, or indirect." *Hemi Group, LLC* v. *City of New York*, 559 U. S. 1, \_\_\_ (2010) (slip op., at 9) (internal quotation marks omitted).[2] We do

_____

[2] Under the traditional doctrine of proximate cause, a tortfeasor is sometimes, but not always, liable when he intends to cause an adverse action and a different adverse action results. See Restatement (Second) Torts §§435, 435B and Comment *a* (1963 and 1964). That issue is not presented in this case since the record contains no evidence that Mu-

not think that the ultimate decisionmaker's exercise of judgment automatically renders the link to the supervisor's bias "remote" or "purely contingent." The decisionmaker's exercise of judgment is *also* a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes. See *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, 704 (2004). Nor can the ultimate decisionmaker's judgment be deemed a superseding cause of the harm. A cause can be thought "superseding" only if it is a "cause of independent origin that was not foreseeable." *Exxon Co., U. S. A.* v. *Sofec, Inc.*, 517 U. S. 830, 837 (1996) (internal quotation marks omitted).

Moreover, the approach urged upon us by Proctor gives an unlikely meaning to a provision designed to prevent employer discrimination. An employer's authority to reward, punish, or dismiss is often allocated among multiple agents. The one who makes the ultimate decision does so on the basis of performance assessments by other supervisors. Proctor's view would have the improbable consequence that if an employer isolates a personnel official from an employee's supervisors, vests the decision to take adverse employment actions in that official, and asks that official to review the employee's personnel file before taking the adverse action, then the employer will be effectively shielded from discriminatory acts and recommendations of supervisors that were *designed and intended* to produce the adverse action. That seems to us an implausible meaning of the text, and one that is not compelled by its words.

Proctor suggests that even if the decisionmaker's mere exercise of independent judgment does not suffice to negate the effect of the prior discrimination, at least the decisionmaker's independent investigation (and rejection)

_____

lally or Korenchuk intended any particular adverse action other than Staub's termination.

of the employee's allegations of discriminatory animus ought to do so. We decline to adopt such a hard-and-fast rule. As we have already acknowledged, the requirement that the biased supervisor's action be a causal factor of the ultimate employment action incorporates the traditional tort-law concept of proximate cause. See, *e.g., Anza* v. *Ideal Steel Supply Corp.*, 547 U. S. 451, 457–458 (2006); *Sosa, supra,* at 703. Thus, if the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action (by the terms of USERRA it is the employer's burden to establish that), then the employer will not be liable. But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified. We are aware of no principle in tort or agency law under which an employer's mere conduct of an independent investigation has a claim-preclusive effect. Nor do we think the independent investigation somehow relieves the employer of "fault." The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision.

JUSTICE ALITO claims that our failure to adopt a rule immunizing an employer who performs an independent investigation reflects a "stray[ing] from the statutory text." *Post*, at 2 (opinion concurring in judgment). We do not understand this accusation. Since a supervisor is an agent of the employer, when he causes an adverse employment action the employer causes it; and when discrimination is a motivating factor in his doing so, it is a "motivating factor in the employer's action," precisely as the text requires. JUSTICE ALITO suggests that the employer should be held liable only when it "should be regarded as having delegated part of the decisionmaking

power" to the biased supervisor. *Ibid.* But if the independent investigation relies on facts provided by the biased supervisor—as is necessary in any case of cat's-paw liability—then the employer (either directly or through the ultimate decisionmaker) will have effectively delegated the factfinding portion of the investigation to the biased supervisor. Contrary to JUSTICE ALITO's suggestion, the biased supervisor is not analogous to a witness at a bench trial. The mere witness is not an actor in the events that are the subject of the trial. The biased supervisor and the ultimate decisionmaker, however, acted as agents of the entity that the plaintiff seeks to hold liable; each of them possessed supervisory authority delegated by their employer and exercised it in the interest of their employer. In sum, we do not see how "fidelity to the statutory text," *ibid.*, requires the adoption of an independent-investigation defense that appears nowhere in the text. And we find both speculative and implausible JUSTICE ALITO's prediction that our Nation's employers will systematically disfavor members of the armed services in their hiring decisions to avoid the possibility of cat's-paw liability, a policy that would violate USERRA in any event.

We therefore hold that if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action,[3] and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA. [4]

_____

[3] Under traditional tort law, "'intent' . . . denote[s] that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." *Id.,* §8A.

[4] Needless to say, the employer would be liable only when the supervisor acts within the scope of his employment, or when the supervisor acts outside the scope of his employment and liability would be imputed to the employer under traditional agency principles. See *Burlington Industries, Inc.* v. *Ellerth*, 524 U. S. 742, 758 (1998). We express no

## III

Applying our analysis to the facts of this case, it is clear that the Seventh Circuit's judgment must be reversed. Both Mulally and Korenchuk were acting within the scope of their employment when they took the actions that allegedly caused Buck to fire Staub. A "reprimand . . . for workplace failings" constitutes conduct within the scope of an agent's employment. *Faragher* v. *Boca Raton*, 524 U. S. 775, 798–799 (1998). As the Seventh Circuit recognized, there was evidence that Mulally's and Korenchuk's actions were motivated by hostility toward Staub's military obligations. There was also evidence that Mulally's and Korenchuk's actions were causal factors underlying Buck's decision to fire Staub. Buck's termination notice expressly stated that Staub was terminated because he had "ignored" the directive in the Corrective Action. Finally, there was evidence that both Mulally and Korenchuk had the specific intent to cause Staub to be terminated. Mulally stated she was trying to "'get rid of'" Staub, and Korenchuk was aware that Mulally was "'out to get'" Staub. Moreover, Korenchuk informed Buck, Proctor's personnel officer responsible for terminating employees, of Staub's alleged noncompliance with Mulally's Corrective Action, and Buck fired Staub immediately thereafter; a reasonable jury could infer that Korenchuk intended that Staub be fired. The Seventh Circuit therefore erred in holding that Proctor was entitled to judgment as a matter of law.

It is less clear whether the jury's verdict should be reinstated or whether Proctor is entitled to a new trial.

―――――――

view as to whether the employer would be liable if a co-worker, rather than a supervisor, committed a discriminatory act that influenced the ultimate employment decision. We also observe that Staub took advantage of Proctor's grievance process, and we express no view as to whether Proctor would have an affirmative defense if he did not. Cf. *Pennsylvania State Police* v. *Suders*, 542 U. S. 129, 148–149 (2004).

The jury instruction did not hew precisely to the rule we adopt today; it required only that the jury find that "military status was a motivating factor in [Proctor's] decision to discharge him." App. 68a. Whether the variance between the instruction and our rule was harmless error or should mandate a new trial is a matter the Seventh Circuit may consider in the first instance.

*       *       *

The judgment of the Seventh Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KAGAN took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

————————

No. 09–400

————————

## VINCENT E. STAUB, PETITIONER *v.* PROCTOR HOSPITAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[March 1, 2011]

JUSTICE ALITO, with whom JUSTICE THOMAS joins, concurring in the judgment.

I agree with the Court that the decision of the Court of Appeals must be reversed, but I would do so based on the statutory text, rather than principles of agency and tort law that do not speak directly to the question presented here.

The relevant statutory provision states:

> "An employer shall be considered to have engaged in [prohibited discrimination against a member of one of the uniformed services] if the person's membership . . . is *a motivating factor in the employer's action*, unless the employer can prove that the action would have been taken in the absence of such membership . . . ." 38 U. S. C. §4311(c)(1) (emphasis added).

For present purposes, the key phrase is "a motivating factor in the employer's action." A "motivating factor" is a factor that "provide[s] . . . a motive." See Webster's Third New International Dictionary 1475 (1971) (defining "motivate"). A "motive," in turn, is "something within a person . . . that incites him to action." *Ibid.* Thus, in order for discrimination to be "a motivating factor in [an] employer's action," discrimination must be present "within," *i.e.*, in the mind of, the person who makes the decision to

take that action. And "the employer's action" here is the decision to fire petitioner. Thus, petitioner, in order to recover, was required to show that discrimination motivated *that* action.

The Court, however, strays from the statutory text by holding that it is enough for an employee to show that discrimination motivated *some other action* and that this latter action, in turn, caused the termination decision. That is simply not what the statute says.

The Court fears this interpretation of the statute would allow an employer to escape liability by assigning formal decisionmaking authority to an officer who may merely rubberstamp the recommendation of others who are motivated by antimilitary animus. See *ante*, at 8. But fidelity to the statutory text does not lead to this result. Where the officer with formal decisionmaking authority merely rubberstamps the recommendation of others, the employer, I would hold, has actually delegated the decisionmaking responsibility to those whose recommendation is rubberstamped. I would reach a similar conclusion where the officer with the formal decisionmaking authority is put on notice that adverse information about an employee may be based on antimilitary animus but does not undertake an independent investigation of the matter. In that situation, too, the employer should be regarded as having delegated part of the decisionmaking power to those who are responsible for memorializing and transmitting the adverse information that is accepted without examination. The same cannot be said, however, where the officer with formal decisionmaking responsibility, having been alerted to the possibility that adverse information may be tainted, undertakes a reasonable investigation and finds insufficient evidence to dispute the accuracy of that information.

Nor can the employer be said to have "effectively delegated" decisionmaking authority any time a decisionmaker "relies on facts provided by [a] biased supervisor."

See *ante*, at 10. A decisionmaker who credits information provided by another person—for example, a judge who credits the testimony of a witness in a bench trial—does not thereby delegate a portion of the decisionmaking authority to the person who provides the information.

This interpretation of §4311(c)(1) heeds the statutory text and would provide fair treatment for both employers and employees who are members of the uniformed services. It would also encourage employers to establish internal grievance procedures similar to those that have been adopted following our decisions in *Burlington Industries, Inc.* v. *Ellerth*, 524 U. S. 742 (1998), and *Faragher* v. *Boca Raton*, 524 U. S. 775 (1998). Such procedures would often provide relief for employees without the need for litigation, and they would provide protection for employers who proceed in good faith.

The Court's contrary approach, by contrast, is almost certain to lead to confusion and is likely to produce results that will not serve the interests of either employers or employees who are members of the uniformed services. The Court's holding will impose liability unfairly on employers who make every effort to comply with the law, and it may have the perverse effect of discouraging employers from hiring applicants who are members of the Reserves or the National Guard. In addition, by leaving open the possibility that an employer may be held liable if it innocently takes into account adverse information provided, not by a supervisor, but by a low-level employee, see *ante*, at 10–11, n. 4, the Court increases the confusion that its decision is likely to produce.

For these reasons, I cannot accept the Court's interpretation of §4311(c)(1), but I nevertheless agree that the decision below must be reversed. There was sufficient evidence to support a finding that at least Korenchuk was actually delegated part of the decisionmaking authority in this case. Korenchuk was the head of the unit in which Staub worked and it was Korenchuk who told Buck that

Staub left his work area without informing his supervisors. There was evidence that Korenchuk's accusation formed the basis of Buck's decision to fire Staub, and that Buck simply accepted the accusation at face value. According to one version of events, Buck fired Staub immediately after Korenchuk informed her of Staub's alleged misconduct, and she cited only that misconduct in the termination notice provided to Staub. See 5 Record 128–129, 267–268, 380–386; App. 74a. All of this is enough to show that Korenchuk was in effect delegated some of Buck's termination authority. There was also evidence from which it may be inferred that displeasure with Staub's Reserve responsibilities was a motivating factor in Korenchuk's actions.*

––––––––––

*See 5 Record 343–344 (testimony that Korenchuk made negative remarks about Staub's Reserve duties before firing him in 1998); *id.*, at 124–126, 352 (testimony that Korenchuk informed Staub of the revenue lost while he was on Active Duty in 2003, that Korenchuk was aware in January 2004 that Staub might be called to Active Duty again, and that "[b]udget was a big issue with [Korenchuk]").