# United States Court of Appeals

## For the Eighth Circuit

_____

No. 15-1930

_____

Farrell Cherry

*Plaintiff - Appellant*

v.

Siemens Healthcare Diagnostics, Inc.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of South Dakota - Rapid City

_____

Submitted: May 16, 2016
Filed: July 21, 2016

_____

Before RILEY, Chief Judge, COLLOTON and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

Plaintiff Farrell Cherry filed suit against his former employer, Siemens Healthcare Diagnostics, Inc., alleging unlawful discrimination on the basis of race in

violation of Title VII of the Civil Rights Act. Cherry now appeals the district court's[1] grant of summary judgment in favor of Siemens. We affirm.

Cherry, who is African American, worked for Siemens from 1981 until 2011, when he was terminated as part of a reduction in force. Cherry worked in the Rapid City, South Dakota, area, and for many years was the sole field service technician serving this area. In 2008, Regional Service Manager Blaine Raymer became Cherry's supervisor. Also in 2008, Dave Eide began working as a second field service technician for Siemens in the Rapid City area. Shortly after he started working for Siemens, Eide began criticizing Cherry's work performance to Raymer. On multiple occasions over the next few years, Raymer and Eide[2] made various derogatory comments to or about Cherry, acted disrespectfully toward Cherry, and told stories and jokes that created a racially hostile environment for Cherry. On one particular occasion at a company dinner in 2011, Raymer demonstrated both animosity toward Cherry and favoritism toward Eide by commenting that he wished Cherry was more like Eide. When Cherry asked for an explanation of this comment, Raymer paused for a long moment before saying "ride a motorcycle." Cherry said that this comment created an uncomfortable atmosphere for everyone at the table, and that he left the dinner shortly afterward. When asked at his deposition what he meant by this comment, Raymer was unable to provide a clear explanation.

Siemens initiated a reduction in force in October 2011. Service Director David Siebert, Raymer's direct supervisor, was responsible for implementing the reduction in force in the region including Rapid City. Siebert was required to identify a total of five employees to be included in the reduction in force: two were employees who chose to retire, and the remaining three—one of whom was Cherry—were the lowest-

---

[1]The Honorable Jeffrey L. Viken, Chief Judge, United States District Court for the District of South Dakota.

[2]Raymer and Eide are both Caucasian.

performing employees in the region. Siebert's assessment of performance was based on the performance reviews done by the employees' immediate supervisors—Raymer, in Cherry's case—from the last three years.

Raymer was not aware of the reduction in force until November 2, 2011, after the employees to be laid off had been selected. Before then, at most Raymer was aware that a reduction in force was likely. Raymer had, however, prepared Cherry's performance reviews, which Siebert relied on when selecting Cherry for layoff. In 2009, Raymer gave Cherry a rating of 3.21 ("achieved") and provided generally positive feedback on Cherry's work performance. In 2010, Raymer gave Cherry a rating of 2 ("partially achieved") and was more critical of Cherry's job performance. In June 2010, Cherry was given a performance improvement plan. In 2011, Raymer again gave Cherry a rating of 2, and provided positive feedback on some aspects of Cherry's work while criticizing others. In 2011, Raymer also frequently complained to Siebert of Cherry's poor work performance, particularly as related to his completion of administrative tasks. In September 2011, when Siebert asked Raymer for a list of employees with current performance improvement plans, Raymer gave Siebert Cherry's name, even though Cherry's performance improvement plan had expired in August 2010. Throughout this period, there was additional mixed information about Cherry's and Eide's relative job performance—for instance, though Eide complained about Cherry's job performance, an internal report in June 2011 ranked Eide as the lowest-rated field engineer in the area. A later draft of the same report ranked Eide second-lowest and Cherry lowest. Despite this, when Raymer suggested to a major client that Cherry be replaced by Eide as their primary service technician, the client flatly refused.

On November 4, 2011, Raymer informed Cherry that his employment with Siemens was being terminated as part of the reduction in force. Cherry subsequently filed suit against Siemens, alleging that his termination was based on race. In March

2015, the district court granted summary judgment in favor of Siemens. Cherry now appeals.

We review the district court's grant of summary judgment de novo. Qamhiyah v. Iowa State Univ. of Sci. & Tech., 566 F.3d 733, 741 (8th Cir. 2009). A grant of summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, we view the evidence in the light most favorable to the non-moving party. Qamhiyah, 566 F.3d at 741. "To survive a motion for summary judgment on [a] race discrimination claim," a plaintiff must "either 'present admissible evidence directly indicating unlawful discrimination,'" or "create 'an inference of unlawful discrimination under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).'" Young v. Builders Steel Co., 754 F.3d 573, 577 (8th Cir. 2014) (quoting Humphries v. Pulaski Cty. Special Sch. Dist., 580 F.3d 688, 692 (8th Cir. 2009)).

Cherry argues that the district court erroneously failed to apply the "cat's paw" analysis, and therefore wrongly concluded that there was no direct evidence of racial discrimination. Under a properly-applied cat's paw theory of liability, Cherry argues, he is entitled to the more favorable mixed motives analysis set out in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). See Stacks v. Sw. Bell Yellow Pages, Inc., 996 F.2d 200, 201–02 (8th Cir. 1993). The cat's paw analysis applies in situations where "a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." Qamhiyah, 566 F.3d at 742 (quoting EEOC v. BCI Coca-Cola Bottling Co. of L.A., 450 F.3d 476, 484 (10th Cir. 2006)). The purpose of this rule is to ensure that "an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or

rubber stamp by which another achieves his or her unlawful design." Id. (quoting Richardson v. Sugg, 448 F.3d 1046, 1060 (8th Cir. 2006)).

The difficulty with applying the cat's paw theory in this case—setting aside the fact that Cherry did not explicitly raise it before the district court—is that Raymer did not actually know of the planned reduction in force at the time he took the allegedly discriminatory actions against Cherry. Raymer's negative performance reviews, in combination with his and Eide's inappropriate comments, may very well have been discriminatory in nature. But it would simply not be possible for Raymer to "use [Siebert] as a dupe in a deliberate scheme to trigger a discriminatory employment action" when Raymer did not know in advance about the impending reduction in force. Had Raymer known and then taken the actions he did with the intention of ensuring that Cherry, rather than Eide, was laid off, perhaps the cat's paw analysis would be applicable. But that is not what happened here. See id. at 744 (comparing Lacks v. Ferguson Reorganized School District R-2, 147 F.3d 718 (8th Cir. 1998) and Kramer v. Logan County School District No. R-1, 157 F.3d 620 (8th Cir. 1998), and noting that the cat's paw rule applied where the subordinate's discrimination had some causal relationship to the adverse employment action). Because the evidence, viewed in the light most favorable to Cherry, does not show a genuine issue of material fact as to Siemens' liability under a cat's paw theory, the district court did not err by proceeding to the McDonnell Douglas analysis.

Cherry alternatively argues that the district court erroneously found that the evidence did not support a finding of pretext in the context of the McDonnell Douglas analysis. Under McDonnell Douglas, once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Richardson, 448 F.3d at 1060. If the employer does so, the burden shifts back to the plaintiff to prove that the proffered justification is a pretext for discrimination. Id. Here, the district court assumed that Cherry had established a prima facie case, and Siemens' proffered nondiscriminatory

justification was the planned, company-wide reduction in force. Pretext may be shown in a variety of ways. Here, Cherry argues that Siemens' proffered explanation is not credible, and that it is more likely that his termination was motivated by discrimination. Though this may be true as to Raymer's actions, there is no evidence in the record to support a finding of pretext as to Siebert, who was the actual decisionmaker. See Loeb v. Best Buy Co., 537 F.3d 867, 873 (8th Cir. 2008) (finding no pretext where the individuals who demonstrated a discriminatory motive were not those responsible for termination).

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of Siemens.

_____