Argued and submitted January 12; reversed and remanded on appeal; cross-appeal dismissed as moot October 5, 2022; petition for review denied March 30, 2023 (370 Or 827)

Denese CROSBIE,
an individual, and
Denese Crosbie RNFA, LLC,
an Oregon limited liability company,
*Plaintiffs-Respondents
Cross-Appellants,*

*v.*

ASANTE,
an Oregon corporation, and
Asante Ashland Community Hospital, LLC
an Oregon limited liability company,
*Defendants-Appellants
Cross-Respondents.*

Jackson County Circuit Court
17CV44213; A173018

519 P3d 551

Defendants appeal from a judgment entered after a jury awarded plaintiff damages for unlawful employment practice under the Oregon Safe Employment Act (OSEA), ORS 654.062. Defendants assign error to the so-called "cat's paw" jury instruction, which allows the jury to impute a subordinate employee's bias to the person who made the adverse employment decision if the subordinate somehow caused the decision-maker's action. Defendants argue that the instruction should only be given when the biased employee is a "supervisor," not a "coworker." *Held*: The "cat's paw" instruction is appropriate where the biased employee is a coworker if there is evidence that that biased coworker actually influenced or was involved in making the adverse employment decision. The instruction in this case was too broad and there was no evidence that the biased coworkers influenced the decision beyond making the initial complaints.

Reversed and remanded on appeal; cross-appeal dismissed as moot.

Timothy C. Gerking, Judge.

Robert Koch argued the cause for appellants-cross-respondents. Also on the opening brief were Anna Sortun, Paul Balmer, and Tonkon Torp LLP. Also on the combined reply brief and cross-answering brief were Anna Sortun and Tonkon Torp LLP.

Mark Lansing and Andrew R. Wilson argued the cause and filed the combined answering and cross-opening brief for respondents-cross-appellants. On the reply brief on cross-appeal were Andrew R. Wilson and Black, Chapman, Petersen & Stevens.

Before James, Presiding Judge, and Lagesen, Chief Judge, and Kamins, Judge.

KAMINS, J.

Reversed and remanded on appeal; cross-appeal dismissed as moot.

**KAMINS, J.**

Defendants Asante and Asante Ashland Community Hospital, LLC,[1] appeal from a judgment entered after a jury awarded plaintiff Denese Crosbie damages for unlawful employment practice under the Oregon Safe Employment Act (OSEA), ORS 654.062. Asante assigns error to one of the jury instructions, known as the "cat's paw" instruction, which allowed the jury to impute the bias of plaintiff's coworkers to Asante in evaluating whether plaintiff's termination was the product of impermissible bias. Plaintiff cross-appeals, assigning error to the trial court's refusal to award prevailing party attorney fees. Because we conclude that the trial court erred in instructing the jury and that the error likely affected the jury's verdict, we reverse the judgment and remand for a new trial and do not reach the cross appeal.

I.   FACTUAL AND PROCEDURAL BACKGROUND

Because the historical facts are relevant primarily to Asante's challenge to the "cat's paw" instruction, we recite those facts "in the light most favorable to the establishment of the facts necessary to require the instruction," in other words, "in the light most favorable to the giving of plaintiff's 'cat's paw' instruction." *Ossanna v. Nike, Inc.*, 365 Or 196, 199, 445 P3d 281 (2019).

Crosbie is an experienced and highly skilled Registered Nurse First Assistant (RNFA) in the field of eye surgery. She had worked at the Ashland Community Hospital for 14 years when Asante purchased it in 2013. Asante terminated Crosbie a few years later, in March 2017. Crosbie sued, asserting, among other things, that she was fired in retaliation for complaining about safety issues.

At trial, Asante argued that Crosbie was fired for her persistent bullying behavior toward other nursing staff. According to Asante's witnesses, Crosbie was rude, dismissive, and prevented the other nurses from forming relationships with the surgeons. Several nurses testified that Crosbie withheld necessary information from them, and even went

---

[1] Except where otherwise noted, we refer to both defendants on appeal as "Asante."

so far as to sabotage them by fabricating mistakes that they did not make. For example, Crosbie was issued a corrective action on January 27, 2017, because "[t]hree separate complaints were received concerning [her] inappropriate behavior," including that she "questioned another employee regarding their practice in a loud, confrontational tone * * * and humiliated the other individual in front of the patient, physician and coworkers" and "made a non-solicited derogatory remark regarding one of her coworkers to a physician." According to the termination notice, three staff members reported that Crosbie refused to "assist a new nurse regarding the appropriate medication to use," then "aggressively slammed her chair."

Crosbie, on the other hand, claimed that she was actually fired in retaliation for reporting safety issues, including violations committed by the other nurses. She testified that safety issues increased in frequency after Asante purchased the hospital due in part to its hiring of inexperienced nurses, and that she often had to step in to correct those nurses' mistakes. In her view, the instances of "bullying" were actually examples of corrections of other nurses' mistakes, and those nurses exaggerated her behavior to protect themselves. For example, she explained that in the incident other nurses characterized as "confrontational" and "humiliat[ing]," she had simply asked the other nurse to confirm the contents of a medication because it was not properly labelled.

Crosbie asserted five claims for relief, three of which ultimately went to the jury: unlawful retaliation under ORS 659A.199[2] and ORS 659A.030,[3] and unlawful employment

---

[2] ORS 659A.199 provides that "[i]t is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation." ORS 659A.199(1).

[3] ORS 659A.030 (2017) provides that "[i]t is an unlawful employment practice * * * [f]or any person to discharge, expel or otherwise discriminate against any other person because that other person has opposed any unlawful practice[.]" ORS 659A.030(1)(f) (2017), *amended by* Or Laws 2021, ch 585, § 10; ch 367, § 35; ch 239, § 4. Because the amendments do not affect our analysis, we refer to the current version of the statute in this opinion.

practice under the OSEA, ORS 654.062.[4] The crux of all three claims was whether protected safety complaints were a "substantial factor" in her termination. In her proposed jury instructions, Crosbie requested the instruction at issue here, entitled "Imputation of Subordinate Bias," otherwise known as the "cat's paw" instruction, which allows the jury to impute a subordinate employee's bias to the person who made the adverse employment decision if the subordinate somehow caused the decision-maker's action. Crosbie's proposed "cat's paw" instruction read:

> "You may impute to [the principal decisionmakers regarding Plaintiff's termination] any biased retaliatory motive against Plaintiff held by a subordinate, if you find that their adverse employment decision was not actually independent because a subordinate had a biased retaliatory motive against Plaintiff and that the same subordinate influenced, affected, or was involved in the adverse employment decision against Plaintiff."

Asante objected, arguing that a "cat's paw" instruction is only appropriate when the biased coworker is a "supervisor" not a "peer." Asante alternatively argued that the instruction should include a negligence standard, in that the instruction must require that the employer knew or should have known about the coworker's unlawful motivation. The trial court decided to give the instruction with Asante's proposed negligence standard:

> "Even if Defendants decision-makers did not harbor any retaliatory intent toward Plaintiff, you may impute to these individuals a biased retaliatory motive against Plaintiff if you find the following by a preponderance of the evidence:
>
> "1)  That a subordinate had a biased retaliatory motive against Plaintiff;

---

[4] ORS 654.062 (2017) provides that "[i]t is an unlawful employment practice for any person to bar or discharge from employment or otherwise discriminate against any employee or prospective employee because the employee or prospective employee has: [o]pposed any practice forbidden by" the OSEA or "[m]ade any complaint or instituted or caused to be instituted any proceeding under or related to" the OSEA. ORS 654.062(5)(a) - (b) (2017), *amended by* Or Laws 2021, ch 336, § 1; ch 293, § 1; Or Laws 2019, ch 350, § 3. Because the amendments do not affect our analysis, we refer to the current version of the statute in this opinion.

"2)   That the same subordinate influenced, affected or was involved in the adverse employment decision against Plaintiff;

"3)   That the Defendant's decision-makers knew, or reasonably should have known, that the subordinate harbored a retaliatory motive; and

"4)   The subordinate's influence, affect or involvement was a substantial factor in Defendant's decision-maker's adverse employment decision regarding Plaintiff."

After the instructions were given and the court asked for exceptions, Asante reiterated that the instruction was improper because "cat's paw" is limited to supervisors and added that the instruction was not supported by the facts because "there was no evidence that the peer employees were aware of the safety reports."

The jury rendered a split verdict, finding for Asante on the general unlawful retaliation claims under ORS 659A.030 and ORS 659A.199 and for Crosbie on the safety-specific retaliation claims under ORS 654.062. It awarded $470,000 in damages. After trial, Crosbie petitioned for attorney fees and costs. The court heard oral argument on the issue, and ultimately denied her request in a supplemental judgment. On appeal, Asante assigns error to the giving of the "cat's paw" instruction, arguing that it misstated the law and was not supported by evidence in the record. Crosbie cross-appeals, assigning error to the denial of attorney fees. Our determination in the appeal obviates the need to address the cross-appeal.

## II.   STANDARD OF REVIEW

We review jury instructions for legal error. *State v. Harper*, 296 Or App 125, 126, 436 P3d 44 (2019). "An instruction is appropriate if it correctly states the law and is supported by evidence in the record." *State v. Basham*, 301 Or App 498, 499, 456 P3d 658 (2019), *rev dismissed*, 366 Or 761 (2020) (citation and brackets omitted).

## III.   ANALYSIS

### A.   *Employment Discrimination and Retaliation*

To prevail on a claim of unlawful discrimination or retaliation under Oregon law, plaintiffs must prove that

1) they have a protected trait or engaged in a protected activity, 2) they suffered an adverse employment outcome, and 3) the protected trait or activity was a "substantial factor" in the adverse decision. *Ossanna v. Nike Inc.*, 290 Or App 16, 28, 415 P3d 55 (2018), *aff'd*, 365 Or 196, 445 P3d 281 (2019). The "protected activity" in this case was plaintiff's reporting of safety violations.[5] The critical question then, which "cat's paw" may (or may not) help answer, is whether, viewed as a whole, the evidence establishes that plaintiff's reporting of safety violations was a substantial factor in her termination.

B.   *The "Cat's Paw" Instruction*

1.   *The principles of "cat's paw"*

The "cat's paw" moniker was coined by Judge Richard Posner, after an Aesop's fable in which a monkey tricks a cat into removing chestnuts from a fire, then steals the chestnuts and leaves the cat with nothing but burnt paws. *See Shager v. Upjohn Co.*, 913 F2d 398, 405 (7th Cir 1990) (using the phrase "cat's paw" in employment law for the first time). In the context of employment law, a biased employee acts as the monkey who tricks their employer (the cat) into taking an adverse action against the plaintiff, leaving the employer liable (burned). In other words, it "refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive." *Vasquez v. Empress Ambulance Service, Inc.*, 835 F3d 267, 272 (2d Cir 2016) (citation omitted); *see also Ossanna*, 365 Or at 209 ("[A]n employer's theoretically neutral decision-maker does not insulate the employer from liability for an adverse employment decision that, in actuality, is based upon biased information or recommendations provided by biased supervisors.").

The Supreme Court recently acknowledged the viability of the "cat's paw" theory in Oregon. *Ossanna*, 365 Or at 198. The court began its reasoning with an analysis of

---

[5] The parties have consistently disagreed and presented competing theories to the jury as to whether plaintiff's complaints to other nurses amount to protected activity or whether such complaints needed to be made through more official channels. We address that issue further below. 322 Or App at 264-65.

federal caselaw on the subject, characterizing it as "instructive" because the doctrine originated from federal employment law. *Id.* at 206. In describing the doctrine's origins in the Seventh Circuit, the court noted that, although every federal circuit court has subsequently adopted it, they have articulated it in "almost as many ways as cats have lives." *Id.* at 207. Observing that the United States Supreme Court had ultimately endorsed the doctrine, the court "join[ed] the above-mentioned courts" and adopted the instruction. *Id.* at 209 (citing *Staub v. Proctor Hospital*, 562 US 411, 131 S Ct 1186, 179 L Ed 2d 144 (2011)). As in *Ossanna*, our analysis considers federal jurisprudence to the extent that it is helpful.

To prevail on a claim of unlawful discrimination or retaliation, a plaintiff must prove that a protected trait or their involvement in a protected activity was a "substantial factor" in the adverse decision. *Ossanna*, 290 Or App at 28. "Cat's paw" provides "a pathway for satisfying the causation requirement" when the decision-maker was not personally biased against the plaintiff but was influenced by another person who was so motivated. *Ossanna*, 365 Or at 210. The plaintiff must still establish that "the requisite causal connection exists between the supervisor's bias and the adverse employment action." *Id.* at 211.

One scholar argues that the "cat's paw" label can itself make mischief by improperly narrowing the inquiry to the specific intention of the decision-makers, implying that other evidence of discrimination is irrelevant. Sandra Sperino, *Caught by the Cat's Paw*, 2019 BYU L Rev 1219, 1228 (2019). For instance, in *Cherry v. Siemens Healthcare Diagnostics, Inc.*, the plaintiff alleged that his supervisor gave him negative performance reviews out of racial animus, which subsequently led to him being terminated as part of a reduction in force. 829 F3d 974, 976 (8th Cir 2016). Despite the fact that the supervisor's racial animus played a role in the plaintiff's termination, the court affirmed summary judgment for the employer because the biased supervisor did not know that a reduction in force was pending, so could not have used the decision-maker as a "'dupe.'" *Id.* at 977 (quoting *Qamhiyah v. Iowa State Univ. of Sci. & Tech.*, 566 F3d 733, 742 (8th Cir 2009)). The concept of a "dupe"

comes from the fable, not a statutory or common law limitation on liability. *See E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F3d 476, 484 (10th Cir 2006) (discussing the decision-maker as a "dupe" in the context of the fable). Recognizing its confusing nature, Judge Posner has himself referred to the metaphor as a "judicial attractive nuisance." *Cook v. IPC International Corp.*, 673 F3d 625, 628 (7th Cir 2012).

Regardless of what one calls it, the ultimate inquiry, as framed above, in an employment retaliation case is whether an employee's protected trait or activity was a substantial factor in the adverse employment decision. The important issue is not dupes, cats, or monkeys, but causation. Because most employers are organizations, which can only act through their agents, the thought processes of the agents who made the decision are often at issue. Showing that the decision-maker was influenced by a biased subordinate is one way that a plaintiff may establish a causal relationship between a protected trait or activity and an adverse employment action. *See Boyd v. Legacy Health*, 318 Or App 87, 104, 507 P3d 715 (2022) (concluding that a reasonable jury could find causation where there was evidence that a biased former supervisor influenced the new supervisor's decision). Thus, the "cat's paw" instruction provides "a pathway for satisfying the causation requirement" in the limited circumstances where a biased employee influenced an unbiased decision-maker to make an adverse employment decision. *Ossanna*, 365 Or at 210. The plaintiff must still establish that "the requisite causal connection exists between the supervisor's bias and the adverse employment action." *Id.* at 211. To the extent that the term "imputing" bias is helpful when determining that a biased employee influenced an unbiased decision-maker's decision, the "cat's paw" instruction has been adopted in Oregon for that purpose.

In this case, the protected activity was plaintiff's statutorily protected complaints about safety violations, and the adverse employment decision was plaintiff's termination. Thus, the question for the jury to answer was whether plaintiff's reports of safety violations were a substantial factor in her termination. The questions before us are whether the jury instruction correctly stated that law and whether

the evidence in the record supports it. *Basham*, 301 Or App at 499.

## 2. *Whether "cat's paw" extends to coworker bias*

Asante argues that the jury instruction incorrectly stated the law because agency principles prevent the imputation of "coworker" bias to the employer because the employer has not imbued coworkers with any management authority. Asante observes that the federal courts, beginning with the Seventh Circuit in *Shager* and including the United States Supreme Court in *Staub*, frequently consider agency principles in considering how "cat's paw" should operate. *Shager*, 913 F2d at 405; *Staub*, 562 US at 418. As the Oregon Supreme Court recognized in *Ossanna*, part of *Shager*'s reasoning relied on the fact that supervisors generally have authority to manage other employees, even if they do not have the authority to singlehandedly demote or fire them. 365 Or at 206-07 (citing 913 F2d at 405). Thus, an employer can be held liable for a supervisor's biased employment recommendation because that action is the kind of thing the employer authorized the supervisor to do. *Id.* (citing *Restatement (Second) of Agency* § 228 (1958)). On the other hand, low-level employees usually do not have the authority to interfere with their coworkers' employment status. Therefore, according to Asante, it does not make sense to apply "cat's paw" when the biased actor is the plaintiff's coworker, not their supervisor, because a coworker is not the employer's agent in employment matters.

We disagree with Asante that the critical fact is whether the biased employee is a "coworker" or a "supervisor." Rather, the propriety of a cat's paw instruction hinges on whether a biased employee held influence over the adverse employment decision—either because the employee was authorized by job duty to do so or because the employer negligently allowed such usurpation. That formulation reflects both the causation and agency origins of the "cat's paw" doctrine. From an agency standpoint, when an employer grants a subordinate authority to take action, such as participate in an employment decision, the employer is vicariously liable for the exercise of that subordinate's authority. *Restatement* §§ 215, 219(1). On the other hand, if the biased

employee is not authorized to take an action, such as influence an employment decision, but is nevertheless enabled to do so by the employer's negligence or recklessness, the employer is also traditionally liable. *Id.* § 219(2)(b). From a causation standpoint, either formulation requires that the biased employee influence the actual employment decision, meaning that the employee's bias could amount to a "substantial factor" in that adverse employment decision.

Although *Ossanna* did not directly address the question of whether "cat's paw" can be used to impute coworker bias, its analysis forecasts that result. The rationale for adopting "cat's paw" as a path to liability did not turn on formal job titles; rather, the court acknowledged that an "employment setting often consists of multiple layers of networks and relationships; organizational models often do not reflect a simple vertical chain of command; and bias can enter the decision-making process through formal or less formal channels." *Ossanna*, 365 Or at 210. Recognizing that "cat's paw" "does not prescribe a particular level of control" that biased employees must have over the decision-making process, the court "agree[d] with the federal courts of appeal" in concluding that the employees must have "influence on or involvement in the decision or decision-making process" for their bias to be imputed. *Ossanna*, 365 Or at 209-10.

The "federal court of appeals" case *Ossanna* cited for that proposition, *Poland v. Chertoff*, is instructive.[6] *Ossanna*, 365 Or at 209-10 (citing *Poland*, 494 F3d 1174, 1182-83 (9th Cir 2007)). *Poland* held that "cat's paw" is appropriate if a biased subordinate "sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action [and] the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process." 494 F3d at 1182 (collecting cases). In *Poland*, the plaintiff had lodged an Equal Employment Opportunity (EEO) complaint against his supervisor, alleging that he was discriminated against due to his age.

---

[6] Our court's pre-*Ossanna* "cat's paw" case law also relied on *Poland* for the same proposition. *La Manna v. City of Cornelius*, 276 Or App 149, 165-66, 366 P3d 773 (2016); *LaCasse v. Owen*, 278 Or App 24, 37, 373 P3d 1178 (2016).

*Id.* at 1178. In alleged retaliation for that complaint, the supervisor reported that the plaintiff was confrontational, argumentative, and disrespectful, and requested that the employer undertake an administrative inquiry into his performance, an inquiry that ultimately led to the plaintiff's transfer. *Id.*

The Ninth Circuit reasoned that the "initiation of the administrative inquiry, on its own, would not be sufficient" to impute bias if the inquiry had been shielded from the biased employee's involvement. *Poland*, 494 F3d at 1183. The inquiry in *Poland* was not so shielded—rather, the supervisor prepared a lengthy memo detailing numerous instances of malfeasance for the inquiry panel to consider, supplied the entire universe of witnesses that the panel interviewed, and provided negative notes on the plaintiff's performance. *Id.* The supervisor's role in defining the scope of the inquiry and in directing the inquiry panel to unfavorable evidence granted him a "pervasive influence" on the inquiry such that his bias may have tainted the results. *Id.* In that event, "the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or the investigation leading thereto." *Id.* at 1184; *see also France v. Johnson*, 795 F3d 1170, 1176 (9th Cir 2015) (applying *Poland* to conclude that the "cat's paw" theory applies when the biased employee has "influence and substantial involvement in the hiring decisions").

Based on this rationale, *Ossanna* relied on *Poland* and the cases it collected to support the ultimate holding that "cat's paw" may be used to impute a subordinate's bias to the ultimate decision-maker only "if the plaintiff can point to evidence that the non-decision-maker influenced or was involved in the adverse employment decision." *Ossanna*, 365 Or at 209. That collection of cases, in turn, underscores the fact that imputation stems from the biased employee's actual involvement in the employment decision or investigation. *See Poland*, 494 F3d at 1182-83 (citing *Laxton v. Gap Inc.*, 333 F3d 572, 584 (5th Cir 2003) (holding that "the discriminatory animus of a manager can be imputed to the ultimate decisionmaker if the [manager] *** 'had influence or leverage over'" the ultimate decision-maker (citation

omitted)); *Abramson v. William Paterson Coll. of N.J.*, 260 F3d 265, 286 (3d Cir 2001) (holding that an employer is liable for the discriminatory actions of employees exhibiting discriminatory animus if they "influenced or participated in the [adverse employment] decision"); *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F3d 46, 55 (1st Cir 2000) ("One method [of proving pretext] is to show that discriminatory comments were made by *** those in a position to influence the decisionmaker."); *Willis v. Marion County Auditor's Office*, 118 F3d 542, 547 (7th Cir 1997) (holding that an employer is liable for a subordinate's discriminatory acts when the subordinate is "able to manipulate the decisionmaking process and to influence the decision")). The take home message from *Ossanna* and the authorities on which it relies is that an employee's job title matters much less than whether they had actual influence on the employment decision.[7]

In sum, the "cat's paw" instruction is appropriate in cases where the biased employee is a coworker if there is evidence that that biased coworker actually influenced or was involved in making the adverse employment decision. Thus, Asante's arguments that the instruction should have been limited to supervisors were correctly rejected.

However, in this case, the instruction's requirement that the jury find that the biased employee "influenced, affected or was involved in" the employment decision was

---

[7] The federal courts of appeals have largely followed this path and required some involvement of the biased employee in the adverse employment decision before their bias can be imputed to the organization. *See, e.g.*, *Theidon v. Harvard Univ.*, 948 F3d 477, 508 (1st Cir 2020) ("cat's paw" inapplicable when biased subordinate did not receive any "special consideration" at any point in the decision-making process but rather was one of a "chorus" of voices); *Marshall v. The Rawlings Co. LLC*, 854 F3d 368, 378 (6th Cir 2017) ("The primary rationale for the cat's paw theory of liability is that, because a company's organizational chart does not always accurately reflect its decisionmaking process, an employee of lower rank may have significant influence over the decisionmaker." (Internal quotation marks and citation omitted)); *Gunderson v. BNSF Ry. Co.*, 850 F3d 962, 970 (8th Cir 2017) (rejecting "cat's paw" theory where the biased subordinate's involvement was limited to submitting the initial workplace complaint to his supervisor and performing "routine tasks" such as arranging the witness interviews); *Haire v. Bd. of Sup'rs of Louisiana State Univ.*, 719 F3d 356, 366 (5th Cir 2013) ("cat's paw" theory appropriate where "a party demonstrating discriminatory animus *had influence* over the official decisionmaker" (emphasis in original; internal punctuation and citation omitted)).

too broad. There is no doubt that the potentially biased nurses' complaints "affected" the ultimate employment decision; indeed, their complaints set the process in motion. As discussed above and highlighted in *Poland*, however, setting a complaint in motion (*i.e.*, "affecting" a decision) is not enough—the biased employee must have been involved in or have influenced the ultimate decision-making process. The alternative would mean that the bias of any employee who provides relevant information to management could be imputed to the employer.

Moreover, that result would contravene the Supreme Court's observation in *Staub* that a biased supervisor who provides false information to management is not analogous to a trial witness who testifies falsely before a judge because a "mere witness is not an actor in the events that are the subject of the trial." 562 US at 421-22. Rather, it is an employee's *participation* in the event—the employment decision—that allows an employee's bias to be imputed to management. *Id.* In this case, even in combination with the requirement that the "[e]ffect *** was a substantial factor in Defendant's decision-makers' adverse employment decision," the instruction as a whole would allow a jury to find a defendant liable when a subordinate's actions merely set the process in motion but where improper motive played no other role and had no influence or involvement in the ultimate employment decision. Accordingly, the instruction's use of the broad phase "influenced, affected, or was involved in" the employment decision without further clarification was improper.

The error was compounded by the fact that the evidence presented at trial uniformly described a decision-making process that was insulated from the nurses' involvement. Indeed, the nurses' immediate supervisor testified that discussing the investigation and employment decision process with the other nurses "would have been completely wrong." Several nurses similarly testified that they were not consulted beyond their initial complaint, a fact that, according to the supervisor's testimony, was frustrating to them as it seemed that their complaints had inspired no action. Given the dearth of evidence of the biased subordinates' involvement in the decision-making process, the "cat's paw"

instruction was improper.[8] Because that instruction allowed the jury to conclude that, if the nurse's distaste for plaintiff's verbal safety corrections "affected" the employment decision, the decision was unlawful, it was not harmless.

3. *The instruction's reference to protected safety complaints was supported by evidence in the record.*

Asante also argues that the instruction was not supported by any evidence of statutorily protected safety complaints, and we briefly address the issue because it is likely to arise again on remand. According to Asante, only Crosbie's reports to management—not corrections made directly to the other nurses—constitute protected activity. Because there was no evidence that the other nurses knew about Crosbie's safety reports to management, Asante contends that the record lacked evidence that the other nurses retaliated based on that protected activity. However, the statute is not limited in the way Asante asserts.

ORS 654.062 not only protects employees who have complained about safety issues to the employer, it also protects those who have "[o]pposed any practice forbidden by" the OSEA. ORS 654.062(5)(a). That provision covers Crosbie's conduct here, in that her acts of directly correcting other nurses' unsafe practices could be considered "opposing" them. The implementing regulations further bolster that conclusion:

> "ORS 654.062(5) does not state to whom or in what manner an individual must oppose a practice in order to be protected from discrimination. Protected actions include the individual communicating opposition to practices forbidden by OSEA or which the individual in good faith believes are prohibited by OSEA to anyone, including but not limited to: (a) *Coworkers*; (b) Employers; and (c) Newspapers and other media."

---

[8] Although Asante did not object to the language "influenced, affected, or was involved in the employment decision," it did object to giving the instruction at all, arguing that it was "not supported based on the case law or the facts in this case." Specifically, Asante argued that peers, unlike supervisors, were not empowered to be involved in the decision, which would lead to "a big expansion in vicarious liability." And although Asante does not specifically argue on appeal that the use of "affected" was problematic, the assignments of error reflect its argument against the broad nature of the instruction.

OAR 839-004-0016(2) (emphasis added). Contrary to Asante's assertion, the OSEA appears to protect Crosbie's verbal corrections to coworkers about safety. Because there was evidence from which the jury could reasonably infer that the other nurses held retaliatory motives based on that protected activity, there was evidence to support the instruction.

Reversed and remanded on appeal; cross-appeal dismissed as moot.