[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-13262
Non-Argument Calendar
_____

D.C. Docket No. 8:16-cv-00928-JDW-MAP

SHERWIN FRASER,

Plaintiff-Appellant,

versus

J.C. PENNEY CORPORATION, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(May 4, 2018)

Before TJOFLAT, NEWSOM and HULL, Circuit Judges.

PER CURIAM:

Sherwin Fraser appeals the district court's order granting summary judgment in favor of his employer J.C. Penney Corp. ("J.C. Penney"), in his employment discrimination action filed pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a), and the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760.10.  Fraser, who is black and a native of Trinidad and Tobago, still works for J.C. Penney.  Fraser's lawsuit involves his allegations that J.C. Penney denied him promotions back in 2012 and 2013 on the basis of his race and national origin.  The district court granted summary judgment to J.C. Penney because Fraser had not shown that the company's legitimate nondiscriminatory reasons for its promotional decisions were pretexts for race and national origin discrimination. After review, we affirm.[1]

## I.  BACKGROUND FACTS

### A.    J.C. Penney's Consolidation of Loss Prevention Positions

The promotion decisions Plaintiff Fraser contends were discriminatory occurred in July 2012 and March 2013.  At that time, J.C. Penney was undergoing a company-wide cost-savings measure by consolidating the separate supervisory

---

[1]We review the district court's grant of summary judgment de novo, applying the same legal standards applied by the district court and construing the evidence in the light most favorable to the non-moving party.  Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1263-64 (11th Cir. 2010).  Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The district court's decision may be affirmed if the result is correct, even if the court relied upon an incorrect ground or gave a wrong reason."  Alvarez, 610 F.3d at 1264.

loss prevention position, known as the Loss Prevention Manager, at one store and a nearby store into one new Area Loss Prevention Leader (ALPL) position, which would then manage those two stores. While the jobs were the same, the person in the ALPL position would now be over two stores, not just one store. This consolidation would mean that one of the two Loss Prevention Managers would lose that particular job.

The new ALPL positions were not posted either internally or externally. Rather, as J.C. Penney identified stores that would have positions consolidated, the human resources department flagged current Loss Prevention Managers whose jobs would be affected, and those supervisors were automatically listed on an internal website as the only candidates to be interviewed for the new ALPL position. J.C. Penney chose to fill the new ALPL positions in this way to streamline the interview process and minimize disruptions in stores that were not affected by the initiative.

## B.    Plaintiff Fraser's Employment in the Orlando District

At the time of this cost-savings consolidation process, Plaintiff Fraser was a Loss Prevention Manager for J.C. Penney's store in Lakeland, Florida. Plaintiff Fraser's supervisor was Lance Butterfield, the District Loss Prevention Manager, who was responsible for about seventeen stores in the Orlando district.

Butterfield's supervisor was the Regional Loss Prevention Director, Marcos Chapman.

Generally speaking, Chapman interviewed candidates and made final loss prevention hiring decisions in his region, but because he was responsible for 14 districts, he relied heavily upon his district loss prevention leaders for recommendations about internal candidates. Chapman frequently reviewed the "bench strength" of internal candidates with his district loss prevention managers, and, when there was an opening in the Orlando district, Butterfield prescreened internal candidates for Chapman, compiling information about each candidate and their store and providing short summaries to Chapman. Chapman usually, but not always, followed Butterfield's recommendations.

## C.    Area Loss Prevention Leader Position Available in 2012

The cost-savings consolidation process did not affect Plaintiff Fraser's store, but it did affect other stores in Butterfield's Orlando district. In April 2012, a new ALPL position was created for two stores in Kissimmee, Florida and Orlando, Florida (the Florida Mall). Initially, Chapman selected David Norville, a Loss Prevention Manager from the Florida Mall for the new ALPL position. The other candidate for this newly created ALPL position was David Mayberry, who was black. Fraser does not contend that the initial selection of Norville as the new

4

ALPL was discriminatory. Shortly after his selection, Norville requested a transfer to California, and by July 2012 the ALPL position was again open.

At that time, Butterfield believed his top internal candidate was Greg Miller, who worked at a store in Daytona, and Plaintiff Fraser was his second best candidate. Butterfield recommended Miller, who is white and American, to Chapman for the open ALPL position, and planned to recommend Plaintiff Fraser if Miller did not accept the position. Butterfield explained that he recommended Miller because Miller had excelled in several stores due to his communication skills and ability to train and manage multiple employees. Butterfield also knew that the new location would significantly shorten Miller's commute. Butterfield did not consider letting both Miller and Plaintiff Fraser interview for the position because Butterfield considered Miller to be his "next person line to move" and his "strongest candidate at the time." Chapman agreed with Butterfield's recommendation and hired Miller for the ALPL position.

Meanwhile, Plaintiff Fraser learned about the ALPL opening from Norville, and, consistent with J.C. Penney policy, advised his store manager that he was interested in the position. A few minutes later, however, Plaintiff Fraser received a call from Butterfield informing him that the position had already been filled by Greg Miller.

5

Butterfield, knowing that Plaintiff Fraser was upset about the promotion decision, offered to help Fraser get ready for the next ALPL opening and encouraged Fraser to get more training.  In an internal email to Plaintiff Fraser's store manager in July 2012, Butterfield stated that Fraser's "next step [was] to a larger store" and he described Fraser as "next in line for an ALPL position" and "now the #2 guy in our district."  In October 2012, Butterfield recommended Plaintiff Fraser for a company development program that would have increased his chances of promotion.

## D.    Two Area Loss Prevention Leader Positions Available in 2013

In February 2013, J.C. Penney identified two more stores in Butterfield's Orlando district for consolidation (Altamonte Springs and Fashion Square Mall), and human resources listed Lisa Donaldson and Carley Veltri on the internal website as the affected Loss Prevention Manager employees to be interviewed for the new ALPL position.  Both Donaldson and Veltri are white.  Around the same time, Butterfield learned that Greg Miller, who had developed brain cancer, would not be returning from medical leave to his ALPL position.  Thus, by March 2013, two ALPL positions were available in the Orlando district, one through the cost-savings consolidation process and one because Miller had left his ALPL position.

Initially, Butterfield planned to recommend that Chapman move Plaintiff Fraser into Greg Miller's vacant position and expected Donaldson and Veltri to

6

interview for the newly created ALPL position.  Butterfield did not consider Plaintiff Fraser to be a candidate for the newly created ALPL position because human resources identified the only candidates for those positions on the internal website as being Donaldson and Veltri, who were directly affected by the cost-savings consolidation process.  Butterfield, however, called Plaintiff Fraser, advised him that Miller's ALPL position would be opening, and told Fraser to get his resume ready to apply for that position.

On March 1, 2013, Butterfield received an email advising him of the newly created APLP position due to cost-savings consolidation and that, per the website, Donaldson and Veltri (the affected employees) were the candidates.  As a result, Butterfield spoke to someone in the home office to advise them that he actually had two open ALPL positions including Greg Miller's now-vacant position. Butterfield asked if Donaldson and Veltri would be interviewing for both ALPL positions, and he was told that Donaldson and Veltri could do so.

On March 4, 2013, after Butterfield informed human resources of Greg Miller's open ALPL position, human resources in an email asked Butterfield if that Miller position should be added to the website.  Butterfield responded that it should.  Butterfield stated that he was following direction from the home office that the two candidates were Donaldson and Veltri.

7

At that point, when Greg Miller's vacant ALPL position was added to the website, only Donaldson and Veltri (both Loss Prevention Managers) were already listed and thus they became the candidates for Miller's position too. Accordingly, Butterfield and Chapman planned to interview only Veltri and Donaldson for the two ALPL positions. Plaintiff Fraser was not listed as a candidate on the website because he worked in a store that was not affected by the cost-savings consolidation. Although Butterfield knew of Plaintiff Fraser's interest in pursuing an ALPL position, he did not tell Chapman or human resources about Fraser.

Butterfield then advised Plaintiff Fraser that he would not be recommending Fraser for Greg Miller's ALPL position, and that instead Donaldson and Veltri would be interviewed by Chapman. Although Butterfield says he tried to explain to Plaintiff Fraser that the reason was that Chapman was limited to the candidates listed on the website, Fraser contends that the only reason Butterfield gave him was that he thought there had been "some kind of falling-out" between Plaintiff Fraser and Chapman in the past. Plaintiff Fraser asked Butterfield how he could get an interview, and Butterfield told him to contact Chapman directly at the home office.

On March 5, 2013, Plaintiff Fraser emailed Chapman expressing his interest in Greg Miller's vacant ALPL position. Butterfield told Chapman that Plaintiff Fraser was a strong candidate, but that there was no need to interview him because

8

they already had two candidates.  Even though Chapman agreed that they already

had two good candidates, he decided to interview Plaintiff Fraser, explaining that

"[i]f [Fraser] hits it out of the park, we'll have a good problem to have."  The next

day, Butterfield advised Plaintiff Fraser that Chapman would interview him on

March 8, 2013.

**E.    Butterfield Gives Donaldson and Veltri Interview Questions in Advance**

Within the last two years, J.C. Penney had adopted a new interviewing

method called behavioral interviewing.  Behavioral interviewing involved posing

either a hypothetical scenario and asking the candidate how they would handle it or

asking the candidate to give an example of how they had handled a particular kind

of scenario in the past, so there were no predetermined correct answers.

When Butterfield went to Donaldson's and Veltri's stores to tell them of

their interviews, both Donaldson and Veltri expressed reservations to Butterfield

about the interview because they had no experience with this interviewing style.

Consequently, Butterfield explained to each of them what behavioral interviewing

entailed and provided them with interview questions.  Veltri also told Butterfield

she was not sure she was prepared for the ALPL position because she had been a

Loss Prevention Manager for only six months, and Butterfield reassured her that

she could learn to do the job.  Butterfield asked Veltri's store manager to conduct a

mock interview and help calm Veltri's concerns.  Butterfield reviewed the questions with Donaldson himself.

When Butterfield gave Donaldson and Veltri the interview questions, he did not yet know that Plaintiff Fraser would also be interviewed.  Once Chapman agreed to interview Plaintiff Fraser, Butterfield had Fraser come to his office to discuss the interview.  Plaintiff Fraser asked his store manager to do a mock interview with him, and the store manager did.  Butterfield said that it did not occur to him to give Plaintiff Fraser the questions because he knew that Fraser had received training at J.C. Penney and was certified in how to conduct behavioral interviews, and Butterfield assumed Fraser would know how to answer the questions.

## F.    Interviews and Hiring Decisions by Chapman

Chapman interviewed Donaldson and Veltri on March 6, 2013, two days before he interviewed Plaintiff Fraser.  Chapman did not offer any positions until all three interviews were completed.  Chapman knew when he interviewed Donaldson and Veltri that he would hire the best qualified of the two for the newly created ALPL position.  Although Chapman would have discussed with Butterfield the basic store data for each candidate—such as external and internal apprehensions, inventory shrinkage rates, returns and refunds—Chapman explained that his biggest concern at the time of the interviews was to find

10

someone with strong leadership and communication skills because an ALPL would need to lead two stores, with a loss prevention team in each store, and thus had double the responsibility. During all three interviews, Chapman used an interview guide created by J.C. Penney with the same scripted questions. Unbeknownst to Chapman, the questions he asked Veltri and Donaldson in their interviews were identical to the questions Butterfield had already provided them.

After Chapman interviewed Donaldson and Veltri, Chapman believed, based on their interviews and his discussions with Butterfield, that he had "two good candidates to fill the two vacant positions" and that Donaldson was the stronger candidate of the two. Nonetheless, Chapman still wanted to see how Plaintiff Fraser would do in his interview. Plaintiff Fraser's interview did not go well, however. In response to Chapman's questions, Fraser repeatedly gave examples of his work in 2006 and 2007 as a Receiving Supervisor, before he had switched to loss prevention, and Fraser did not discuss current examples of his work with his loss prevention team at the Lakeland store.

Based in large part on their interview performances, Chapman ultimately decided to hire Donaldson for the newly created ALPL position (which was only available to Donaldson and Veltri) and Veltri for Greg Miller's vacant ALPL positions. During the interviews and hiring decision, Chapman was unaware that Butterfield had given Donaldson and Veltri any questions ahead of time. Later,

11

when Chapman learned what Butterfield had done, Chapman verbally disciplined Butterfield and told Butterfield that, while he could help candidates prepare for interviews by asking them sample questions, he could not give them copies of the actual questions.

A few days after the interviews, Butterfield called Plaintiff Fraser to inform him he did not receive the ALPL position, reviewed his performance in the interview with him, and gave Fraser suggestions on how to improve his interview skills.  Butterfield told Plaintiff Fraser he wanted to prepare Fraser for a future position and encouraged Fraser to interview for J.C. Penney's 2014 development program.

**G.    Fraser's Continued Employment with J.C. Penney**

Plaintiff Fraser remained in his Loss Prevention Manager position at the Lakeland store until the spring of 2014.  At that time, J.C. Penney determined that the Florida Mall store was too large to be consolidated with another store and needed its own loss prevention manager.  Butterfield notified Fraser of the opening, and, on March 16, 2014, after an interview with a J.C. Penney recruiter, Chapman selected Fraser for the new Florida Mall Loss Prevention Manager position.  In Butterfield's 2016 performance evaluation of Plaintiff Fraser, Butterfield continued to recommend Fraser for J.C. Penney's development program (which Fraser declined to pursue) and stated that his goal was to ensure

12

Fraser was ready for a position as a District Loss Prevent Manager position by 2017.

## II.  GENERAL PRINCIPLES

As Fraser relies on circumstantial evidence to prove his race and national origin discrimination claims, we use the McDonnell Douglas burden-shifting framework to evaluate his claims at the summary judgment stage.  Springer v. Convergys Customer Mgmt. Grp Inc., 509 F.3d 1344, 1347 (11th Cir. 2007).[2] Under the McDonnell Douglas framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010).  If the plaintiff does so, a presumption of discrimination arises, and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action.  Id.  If the employer carries its burden of production by proffering such a reason, the presumption is rebutted and the plaintiff then must show that the employer's reason was pretext for discrimination.  Id. While intermediate burdens shift back and forth, the ultimate burden of persuading the trier of fact that the

---

[2]See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1756 (1973); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089 (1981).

13

employer intentionally discriminated against the plaintiff remains with the plaintiff. Id.[3]

As in the district court, on appeal the parties do not dispute that Fraser established a prima facie case of discrimination as to each ALPL promotion, and that J.C. Penney articulated legitimate, nondiscriminatory reasons for each of its decisions not to promote Fraser to the ALPL positions. Specifically, as to the 2012 decision, Plaintiff Fraser was not considered for the ALPL position because Greg Miller was considered the stronger candidate due to his prior work experience in multiple stores, positive relationships with coworkers, and job proficiency, and because the new store location would significantly decreased Miller's commute time. As to the 2013 decisions, Plaintiff Fraser was not eligible for the newly created ALPL position because that position was a result of the costs-savings consolidation process and Fraser was not an affected employee. Additionally, Plaintiff Fraser was not selected for Greg Miller's now-vacant position because Fraser performed poorly in his interview.

Thus, the only issue is whether Fraser submitted evidence at summary judgment from which a reasonable jury could find that J.C. Penney's reasons were

---

[3]Because the FCRA, like Title VII, makes it unlawful for an employer to discriminate on the basis of protected factors such as race or national origin, claims under the FCRA are analyzed under the same framework as Title VII claims. See Jones v. United Space All., L.L.C., 494 F.3d 1306, 1310 (11th Cir. 2007). Thus, we need not address Fraser's FCRA claim separately

14

"not its true reasons, but were a pretext for discrimination." See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252, 101 S. Ct. 1089, 1093 (1981).  A plaintiff can show that an employer's reasons were pretext "by revealing such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in the employer's proffered reason such that "a reasonable factfinder could find them unworthy of credence."  Springer, 509 F.3d at 1348 (quotation marks omitted). "However, a reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason."  Id. at 1349 (quoting Brooks v. Cty. Comm'n of Jefferson Cty., 446 F.3d 1160, 1163 (11th Cir. 2006)); see also Alvarez, 610 F.3d at 1264 (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148, 120 S. Ct. 2097, 2109 (2000)).

To show pretext, the plaintiff must meet the employer's reason head on and rebut it; he cannot simply recast the reason, quarrel with its wisdom, or substitute his own business judgment for that of his employers.  See Alvarez, 610 F.3d at 1265-66.  In the promotion context specifically, "a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he coveted."  Springer, 509 F.3d at 1349 (internal quotation marks omitted).  Rather, the disparities in qualifications must be "of such weight and significance that no reasonable person, in the exercise of

15

impartial judgment, could have chosen the candidate selected over the plaintiff."

Id. (internal quotation marks omitted).[4]

### III.  FRASER'S FAILURE TO PROMOTE CLAIMS

Here, Fraser did not show that J.C. Penney's reasons for its decisions not to

promote Fraser in either 2012 or 2013 were false or that the real reason was

discrimination.

### A.    2012 ALPL Position

As to the 2012 ALPL position, Plaintiff Fraser did not present evidence to

rebut the testimony of Chapman and Butterfield that they routinely assessed the

"bench strength" of Butterfield's internal candidates even before an opening

existed, that Butterfield had already identified Greg Miller as the top candidate for

the next promotional opportunity based on merit, and that Butterfield considered

Plaintiff Fraser to be the second best candidate and planned to recommend him if

Miller did not accept the position.  In fact, Plaintiff Fraser testified that, in his

---

[4]Fraser points out that the district court's summary judgment order stated that to show pretext, any disparity in qualifications between candidates must be so great "as virtually to jump off the page and slap you in the face," an articulation of the standard the Supreme Court has rejected.  See Ashe v. Tyson Foods, Inc., 546 U.S. 454, 457, 126 S. Ct. 1195, 1197 (2006) (rejecting this wording as an "unhelpful and imprecise" elaboration of the standard and remanding for a better articulation of the standard).  The correctly articulated standard in this Circuit is that the "'disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'"  Id. at 1197, 126 S. Ct. 1197 (quoting Cooper v. Southern Co., 390 F.3d 685, 732 (11th Cir. 2004)).  Applying the correct standard, we find no reversible error in the district court's granting of summary judgment to J.C. Penney for the reasons discussed in this opinion.

16

position as Loss Prevention Manager at the Lakeland store, he likewise was "constantly looking" at store employees for possible advancement and that when a position on his loss prevention team opened up, he would approach store employees who showed potential and offer them the position.

Plaintiff Fraser also presented no evidence that he was more qualified than Miller, much less that he was so much more qualified than Miller that no reasonable person, in the exercise of impartial judgment, could have chosen Miller over Fraser. Moreover, Plaintiff Fraser presented no evidence to dispute Butterfield's particular reasons for recommending Miller to Chapman—that Miller had worked at multiple stores, had excellent communication skills, and was good at training and managing multiple employees and that the promotion would significantly shorten Miller's commute time, allowing him to spend more time in the stores.

## B.    2013 ALPL Positions

As to the 2013 promotions, Plaintiff Fraser does not dispute that it was J.C. Penney's policy during the cost-savings consolidation process to consider only those Loss Prevention Managers who were affected by the consolidation as candidates for the newly created ALPL positions. Thus, it is undisputed that Plaintiff Fraser was not a candidate for the newly created ALPL position ultimately given to Donaldson. Instead, when he interviewed, Plaintiff Fraser was vying for

only one position, the ALPL position vacated by Greg Miller (which Veltri ultimately received).[5]

Chapman's reason for not choosing Plaintiff Fraser for Greg Miller's now-vacated ALPL position was Fraser's poor performance during his interview. We have held that a subjective reason, including interview performance, qualifies as a "legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion." See Chapman v. AI Transp., 229 F.3d 1012, 1034 (11th Cir. 2000) (en banc). Plaintiff Fraser does not contend that he performed well during the interview or dispute Chapman's specific criticisms of his interview performance. Thus, Fraser has not shown that J.C. Penney's proffered reason for not promoting Fraser to Greg Miller's ALPL position was false.

Plaintiff Fraser argues that he showed Chapman's reason was pretext by presenting evidence that Fraser's qualifications were superior to those of Donaldson and Veltri, stressing in particular the shrinkage rate at his Lakeland store. But, Chapman did not choose either Donaldson or Veltri over Plaintiff Fraser because they were more qualified or because they had better shrinkage rates. In his deposition, Chapman explained that while he would have discussed some of

_____

[5]If Veltri had not been selected for Miller's job, her position as a Loss Prevention Manager would have been eliminated through the cost-savings consolidation process, and she would have lost that job, but Veltri would have been moved into her previous position as a Loss Prevention Officer.

18

the candidates' store metrics with Butterfield before the interviews, he was more concerned with the candidates' leadership and communication skills. Similarly, Butterfield testified that he did not provide Chapman with more detailed store numbers for the three candidates because Chapman was going to make his decision based on the interviews.

We recognize that both Chapman and Butterfield readily admitted that some of Plaintiff Fraser's performance measures were very good and better than Donaldson's and Veltri's performance measures. But, they also explained that the candidates' metrics had to be examined in context to evaluate how well each performed in his or her particular store and that each candidate had strengths and weaknesses. In any event, Plaintiff Fraser, by arguing about the candidates' store metrics, is merely recasting J.C. Penney's proffered reason for not picking Fraser—his poor interview performance—and is quibbling with the wisdom of that reason, neither of which can show pretext. See Alvarez, 610 F.3d at 1265-66.

## C.    Fraser's "Cat's Paw" Argument

Rather than rebut head on Chapman's reason for not choosing Plaintiff Fraser for Greg Miller's now-vacant ALPL position, Plaintiff Fraser instead argues that Chapman was merely Butterfield's "cat's paw" and that a jury could infer Butterfield had a discriminatory motive. Under the cat's paw theory, causation may be established if the plaintiff shows that the decisionmaker, although not

19

biased, followed another's biased recommendation for termination without independently investigating the complaint against an employee.  See Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999) (citing Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998)); see also Staub v. Proctor Hosp., 562 U.S. 411, 420-21, 131 S. Ct. 1186, 1193 (2011) (involving a claim of military discrimination under the Uniformed Services Employment and Reemployment Rights Act).  Here, applying the cat's paw theory to Fraser's promotion claims, we conclude that J.C. Penney could be liable for failure to promote if, as Fraser argues, Butterfield had a discriminatory bias and then in turn influenced Chapman in his promotion decisions as to Fraser.

As to Butterfield's discriminatory bias, Plaintiff Fraser points to these actions by Butterfield: (1) when Greg Miller's ALPL position opened up, Butterfield instructed Human Resources to add it to the internal website, which meant only Donaldson and Veltri were listed as candidates for the position even though that opening was due to Miller's brain cancer and not a result of the cost-savings consolidation process; (2) Butterfield did not tell Human Resources or Chapman about Fraser's interest in Greg Miller's ALPL position; (3) after Fraser emailed Chapman asking for an interview, Butterfield suggested that Fraser did not need to be interviewed because the website already had the two candidates of Donaldson and Veltri; and (4) and Butterfield provided the interview questions to

Donaldson and Veltri, something he had never done before, and then made sure they were prepared for the interview—all things he did not do for Fraser.

Fraser, however, takes these items out of context and ignores many other undisputed facts that show Butterfield tried to help Fraser too and was not acting in a discriminatory manner. As plaintiff Fraser acknowledges, Butterfield consistently gave Fraser high marks on his performance evaluations and positive feedback about his work, encouraged Fraser to pursue advancement and take on additional responsibilities, and repeatedly recommended Fraser for J.C. Penney's leadership development program so that Fraser could advance.

Further, it is undisputed that at the time of the 2013 ALPL openings, Butterfield considered Plaintiff Fraser to be his next candidate in line for an ALPL position. When Butterfield learned that Miller would be unable to return from his medical leave, Butterfield initially identified Plaintiff Fraser as the only candidate and told Fraser he planned to recommend him to Chapman for the position. Indeed, Butterfield initially, and without prompting, told Plaintiff Fraser of the Miller opening and to prepare his resume. It was only after Butterfield learned of the other, newly created ALPL position, for which only Donaldson and Veltri could be candidates, and after the home office told Butterfield to list both ALPL openings together on the internal website, that Butterfield believed he could no longer recommend Plaintiff Fraser to Chapman. Moreover, once Donaldson and

21

Veltri were identified on the website as the only candidates for both ALPL positions, Chapman and Butterfield made no effort to interview any other candidates, inside or outside the company. Nonetheless, Butterfield suggested Plaintiff Fraser reach out to Chapman directly to ask for an interview, which worked. Plaintiff Fraser got an interview with Chapman.

Finally, though plaintiff Fraser relies on the isolated fact that Butterfield provided the interview questions to Donaldson and Veltri (but not to Fraser) before the interview, Fraser takes that fact out of context and fails to demonstrate how this is evidence of discriminatory motive. Butterfield offered an innocent explanation for why he gave the interview questions to Donaldson and Veltri, but not to Plaintiff Fraser—that Fraser was familiar with behavioral interviewing and Donaldson and Veltri were not. Plaintiff Fraser has not presented any evidence to dispute this explanation. The record reflects that Plaintiff Fraser had received training in how to conduct behavioral interviewing, but that Donaldson and Veltri, who had not received training, were nervous about their interviews. Furthermore, Butterfield said that, although it did not occur to him to give the questions to Plaintiff Fraser, he would have given them to Fraser "[i]n a heartbeat" if Fraser had asked for them. While Butterfield's admitted conduct shows poor judgment, it

22

does not show discrimination, especially given Butterfield's consistent history of trying to help Fraser.[6]

## IV.  EEOC REASONABLE CAUSE DETERMINATION

Finally, to show discriminatory intent, Plaintiff Fraser relied on the Equal Employment Opportunity Commission's ("EEOC") right-to-sue letter finding reasonable cause to believe a Title VII violation had occurred.  The EEOC's letter stated that Fraser's allegations had merit because, although J.C. Penney said that Fraser was not selected for the 2013 ALPL position because of poor interview performance, Fraser was the most senior and most qualified candidate.  The letter pointed out that J.C. Penney had promoted Fraser six times in nine years and stated that Fraser's store metrics were better than the other two candidates' store metrics and that Fraser had met his 2012 store performance goals, while the other two candidates had not.  The letter also noted that the other two applicants were given interview questions ahead of time and "prepped on how to answer" them.

On appeal, Plaintiff Fraser contends that the district court failed to adequately consider the EEOC's letter.  In its summary judgment order, the district court noted that it must consider the EEOC's letter as evidence, but that it was not

---

[6]Fraser admits that Butterfield never made any inappropriate comments regarding his race or national origin.  Although Fraser relies on Veltri's testimony, Veltri also said she had heard Butterfield say positive, not negative, things about Fraser.

required to defer to the EEOC's legal conclusions. The district court stated that the letter was "considered, but as discussed, Fraser fails to demonstrate pretext."

The district court was not required to defer to the EEOC's reasonable cause determination. Rather, the district court was required to review the summary judgment evidence de novo to determine whether it presented a genuine issue of material fact. See Barfield v. Orange Cty., 911 F.2d 644, 649-50 (11th Cir. 1990) (holding that the district court has discretion to decide whether to admit an EEOC determination during a jury trial and is "guided by such considerations as whether the report contains legal conclusions, in addition to its factual content"); Moore v. Devine, 767 F.2d 1541, 1549-51 (11th Cir. 1985) (explaining that, because the parties are entitled to a de novo trial, the district court cannot be bound by an EEOC determination), modified on reh'g, 780 F.2d 1559, 1560 (11th Cir. 1986 (clarifying that EEOC determinations for federal employees are different and may be binding on the courts).

In its summary judgment order, the district court addressed the facts the EEOC relied upon to reach its determination—each candidate's store shrinkage rate and Butterfield's actions in giving Donaldson and Veltri the interview questions—and concluded that those facts, along with others not discussed in the EEOC letter, did not show pretext for discrimination. The district court was not required to address the EEOC's letter further.

24

## V.  CONCLUSION

For the forgoing reasons, we affirm the district court's order granting summary judgment to J.C. Penney on Plaintiff Fraser's Title VII and FCRA claims.

**AFFIRMED.**